UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALTAGRACIA SANCHEZ<br>2610 Tenth Street NE<br>Washington, DC 20018<br><br>DALE SORCHER<br>7309 Millwood Road<br>Bethesda, MD 20817<br><br>JILL HOMAN<br>4919 Seventh Street NW<br>Washington, DC 20011<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF THE STATE<br>SUPERINTENDENT OF EDUCATION<br>1050 First Street NE<br>Washington, DC 20002<br><br>DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue NW<br>Suite 316<br>Washington, DC 20004<br><br>Defendants. | Civil Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This lawsuit seeks to vindicate the rights of day-care providers in Washington,

D.C., to earn their living caring for young children and the rights of parents to choose whom to

trust to care for their children. Defendant Office of the State Superintendent of Education

("OSSE") recently promulgated regulations that require day-care providers to obtain a college degree in order to keep their jobs. As a result, people who struggle to feed their own families will be forced to attend and pay for irrelevant college courses, such as public speaking and "comparative religion," while working full time. Day cares that employ staff who do not meet the college requirement will face fines, criminal penalties, and closure. Plaintiffs are a parent and two dedicated, competent day-care providers who stand to lose their jobs because of OSSE's new regulations.

2.      In a race to be among the first to require college degrees for day-care providers, OSSE enacted its new regulations via administrative rulemaking with no oversight from the D.C. City Council. At the time the rule was promulgated (December 2, 2016), District of Columbia law provided no legislative oversight of OSSE's rulemaking and no avenue by which affected persons could challenge the rulemaking as arbitrary, capricious, or contrary to law.

3.      On November 17, 2017 (nearly a year after OSSE initially promulgated the regulations), the agency compounded day-care providers' uncertainty by proposing to extend the deadlines by which they must acquire their credentials. But after five months, OSSE has done nothing to finalize these changes. Meanwhile, hundreds of day-care staff are left to wonder whether they must meet existing deadlines as close as seven months from now. This uncertainty is intolerable.

4.      The U.S. Constitution forbids OSSE from acting without sufficient oversight by the legislature or the courts. Moreover, the college requirement also violates Plaintiffs' right to earn a living without unreasonable government interference and to equal protection of the laws. Defendants must be enjoined from enforcing OSSE's new day-care rulemaking.

## JURISDICTION AND VENUE

5.      Plaintiffs bring this civil-rights lawsuit pursuant to Article I, Section 8, clause 17

of the U.S. Constitution and the Due Process Clause of the Fifth Amendment to the United States

Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act,

28 U.S.C. § 2201.

6.      Plaintiffs seek declaratory and injunctive relief against the enforcement of

OSSE's December 2, 2016 Final Rulemaking; sections 165 and 170 of Chapter 1, Child

Development Facilities: Licensing, of Title 5-A of the District of Columbia Municipal

Regulations (D.C. Mun. Regs. tit. 5-A, §§ 165 and 170); and the practices and policies of

Defendants that deny Plaintiffs' constitutional rights.

7.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiff Altagracia Sanchez is a United States citizen and a resident of

Washington, D.C.

10.     Plaintiff Dale Sorcher is a United States citizen and a resident of Bethesda,

Maryland.

11.     Plaintiff Jill Homan is a United States citizen and a resident of Washington, D.C.

12.     Defendant OSSE is the D.C. administrative agency that promulgated the District's

day-care licensing regulations by rulemaking and is charged with enforcing them. *See* D.C. Mun.

Regs. tit. 5-A, § 100.1.

13.     Defendant District of Columbia is a municipal entity organized under the

Constitution and the laws of the United States.

## FACTUAL ALLEGATIONS

### OSSE's Day-Care Licensing Regulations and the College Requirement

14.    The District is one of three jurisdictions in the country that require day-care staff other than day-care center directors to obtain a college degree in order to work. The other two states are Pennsylvania and Vermont.

15.    Day cares in the District, unlike day cares elsewhere, typically serve children ages zero to three, because older children are in school due to the city's universal pre-Kindergarten. *See* Pre-K Enhancement and Expansion Amendment Act of 2008, D.C. Law 17-202, D.C. Code § 38-271.02.

### *OSSE's Rulemaking and the CCDBG Act*

16.    OSSE promulgated the District's current day-care licensing regulations, D.C. Mun. Regs. tit. 5-A, §§ 100–199, through an administrative rulemaking that became effective December 2, 2016 ("the Rulemaking"). On November 17, 2017, OSSE proposed another rulemaking to extend the deadlines by which day-care providers must obtain their new credentials ("the Proposed Extension").

17.    The Rulemaking repealed the District's old day-care licensing regulations, D.C. Mun. Regs. tit. 29, §§ 300–379, and replaced them with D.C. Mun. Regs. tit. 5-A, §§ 100–199.

18.    The original purpose of the Rulemaking was to comply with the federal Child Care and Development Block Grant Act of 2014 ("CCDBG Act"), 42 U.S.C. §§ 9858 *et seq. See* OSSE Notice of Final Rulemaking, 63 D.C. Reg. 14640 (Dec. 2, 2016), https://osse.dc.gov/ sites/default/files/dc/sites/osse/publication/attachments/Final%20Rulemaking%20for%20the%20 Licensing%20of%20Child%20Development%20Facilities_0.pdf.

19.     The CCDBG Act appropriated federal funds to the states for child-care programs. In order to receive CCDBG Act funds, states must create a plan to revise their day-care licensing laws to implement quality monitoring, reporting, inspection, consumer and provider education, licensing, training, child-to-provider ratio, health and safety, special-needs, and disaster-preparedness requirements. *See* 42 U.S.C. § 9858c; 45 C.F.R. §§ 98–99.

20.     The CCDBG Act does *not* require or recommend that states increase day-care providers' education requirements. *See* 42 U.S.C. § 9858c(c)(2)(G)(iv) ("The Secretary [of Health and Human Services] shall not require an individual or entity that provides child care services for which assistance is provided . . . to acquire a credential to provide such services.").

### *Who Must Be Licensed*

21.     All day-care facilities in the District of Columbia must be licensed by OSSE. *See* D.C. Code § 7-2034(a); D.C. Mun. Regs. tit. 5-A, § 102.1.

22.     The Rulemaking denotes four different kinds of day cares: day-care centers, home day cares, expanded-home day cares, and out-of-school-time programs.

23.     All day cares located outside a provider's home and serving more than twelve children ("day-care centers") must be licensed. *See* D.C. Mun. Regs. tit. 5-A, §§ 101.3(c)(1), 199.1.

24.     All day cares located in a provider's home and serving up to six children ("home day cares") must be licensed. *See id.* at §§ 101.3(c)(2), 199.1.

25.     All day cares located in a provider's home, serving no less than seven and up to twelve children ("expanded-home day cares"), must be licensed. *See id.* at §§ 101.3(c)(3), 199.1.

26.     All day cares that provide care for children of legal school age who are enrolled in public, private, and charter schools before or after normal school hours ("out-of-school-time programs") must be licensed. *See id.* at §§ 101.3(c)(4), 199.1.

27.     Many child-care providers are exempt from the District's day-care licensing laws. These include babysitters; nannies; nanny-shares; parent-supervised play groups; adult gyms or clubs that provide child-care services as a benefit of membership; adult-education programs that provide temporary child care while parents are on the campus; child-centered businesses that provide sessions, classes, or activities such as tutoring, music, dance, sport, or art while parents are on the premises; places of worship that provide child care during religious services; care by related persons; federal facilities operated by the federal government; pre-Kindergarten through 12th grade public and charter schools; pre-Kindergarten through 12th grade private schools providing education during the full school day; OSSE-funded pre-Kindergarten facilities; and facilities that provide *only* before- or after-school care or summer camp for school-age children. *See id.* at § 101.5.

### *Staff Qualifications Under the Rulemaking: Day-Care Center Directors*

28.     As a result of the Rulemaking, day-care center directors must obtain a bachelor's degree by December 2, 2022.

29.     As a result of the Rulemaking, newly hired day-care center directors must have at least a bachelor's degree from an accredited college with at least 15 semester credit hours in early-childhood development, early-childhood education, elementary education, or early special education, and one year of supervised experience working with children in a licensed day care. *See id.* at § 164.1(a).

30.     As a result of the Rulemaking, day-care center directors who have already earned

an associate's degree from an accredited college with a major in early-childhood education or

early-childhood development and have at least three years of supervised experience working

with children in a licensed day-care center may retain their jobs or be hired on the condition that

they obtain a bachelor's degree from an accredited school in compliance with D.C. Mun. Regs.

tit. 5-A, § 164.1(a) by December 2, 2022. *See id.* at § 164.1(b).

31.     As a result of the Rulemaking, day-care center directors who (1) are already

employed as a director as of December 2, 2016; (2) have earned at least 48 semester credit hours

from an accredited college, with at least 15 hours in early-childhood education or early-

childhood development; and (3) have at least four years of experience working with children in a

licensed day-care center may keep their jobs, provided that they obtain their bachelor's degree in

compliance with D.C. Mun. Regs. tit. 5-A, § 164.1(a) or (b) by December 2, 2022. *See id.* at

§ 164.1(c).

32.     Private, parochial, or independent schools are exempt from the director-education

requirement if the school (1) has a pre-Kindergarten, elementary, or secondary education

program; (2) cares for infants and toddlers on the same premises as school-age children; (3) is

accredited by a body approved by OSSE; and (4) does not offer subsidized child care. *See id.* at

§ 164.4.

33.     Certain day-care center directors may apply to have the director-education

requirement waived. Any day-care center director employed on December 2, 2016, who has

continuously served as a day-care center director for the past ten years may submit an application

for an experience waiver. *See id.* at § 164.3.

34.    OSSE may deny an experience waiver for any reason consistent with its reasons for denying a hardship waiver, described below at paragraphs 57–61. *See id.*

35.    OSSE issues experience waivers at its discretion, and they can be revoked at any time. *See id.* at § 106.5.

### *Staff Qualifications Under the Rulemaking: Day-Care Center Teachers*

36.    As a result of the Rulemaking, day-care center teachers must obtain an associate's degree by December 2, 2020. If promulgated, the Proposed Extension would extend this deadline to December 2, 2023.

37.    As a result of the Rulemaking, day-care center teachers with no experience must have at least an associate's degree from an accredited college with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 165.1(a).

38.    As a result of the Rulemaking, day-care center teachers with one year of supervised experience working with children in a licensed day-care center (as of December 2, 2016) must have at least an associate's degree from an accredited college with any major, *provided that* they have at least 24 credit hours in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 165.1(b).

39.    As a result of the Rulemaking, day-care center teachers with two years of supervised experience working with children in a licensed day-care center (as of December 2, 2016) must have earned at least 48 semester credit hours from an accredited college, of which 15 hours must be in early-childhood education, early-childhood development, or child and family studies; *provided that* they obtain by December 2, 2020, at least (1) an associate's degree with a major in early-childhood education, early-childhood development, child and family studies, or a

closely related field; *or* (2) an associate's degree in any major with at least 24 semester credit hours in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 165.1(c). If promulgated, the Proposed Extension would extend this deadline to December 2, 2023.

40.    As a result of the Rulemaking, day-care center teachers who have a high-school diploma or its equivalent and a Child Development Associate credential ("CDA") for the correct age classification may work as a teacher, provided that they obtain an associate's degree in compliance with D.C. Mun. Regs. tit. 5-A, § 165.1(a) or (b) by December 2, 2020. *See id.* at § 165.1(d). If promulgated, the Proposed Extension would extend this deadline to December 2, 2023.

41.    A CDA costs $425, requires 120 hours of child-care specific training, and takes a few months to a year to obtain.

42.    Private, parochial, or independent schools are exempt from the teacher-education requirement if the school (1) has a pre-Kindergarten, elementary, or secondary education program; (2) cares for infants and toddlers on the same premises as school-age children; (3) is accredited by a body approved by OSSE; and (4) does not offer subsidized child care. *See id.* at § 165.6.

43.    Certain day-care center teachers may apply to have the teacher-education requirement waived. Any teacher in a day-care center employed on December 2, 2016, and who has continuously served as a teacher for the past ten years may submit an application for an experience waiver. *See id.* at § 165.4.

44.    OSSE may deny an experience waiver for any reason consistent with its reasons for denying a hardship waiver, described below at paragraphs 57–61. *See id.*

45.   OSSE issues experience waivers at its discretion, and they can be revoked at any time. *See id.* at § 106.5.

### *Staff Qualifications Under the Rulemaking: Day-Care Center Assistant Teachers*

46.   As a result of the Rulemaking, day-care center assistant teachers must have a high-school diploma or its equivalent and must obtain a CDA by December 2, 2018. *See id.* at § 166.1. If promulgated, the Proposed Extension would extend this deadline to December 2, 2019.

47.   Private, parochial, or independent schools are exempt from the assistant-teacher education requirement if the school (1) has a pre-Kindergarten, elementary, or secondary education program; (2) cares for infants and toddlers on the same premises as school-age children; (3) is accredited by a body approved by OSSE; and (4) does not offer subsidized child care. *See id.* at § 166.4.

48.   No experience waiver is available to day-care center assistant teachers.

### *Staff Qualifications Under the Rulemaking: Expanded-Home Day-Care Caregivers*

49.   As a result of the Rulemaking, caregivers in expanded-home day cares must obtain an associate's degree by December 2, 2019. If promulgated, the Proposed Extension would extend this deadline to December 2, 2023.

50.   As a result of the Rulemaking, caregivers in expanded-home day cares must have at least one year of experience working with children in a licensed day-care center or home day care and at least an associate's degree from an accredited college with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 170.2(a)(1) & (b).

51.    As a result of the Rulemaking, caregivers in expanded-home day cares who have a high-school diploma or its equivalent, a CDA, and at least one year of experience working with children in a licensed day-care center or home day care may continue to work, provided that they obtain at least an associate's degree with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field by December 2, 2019. *See id.* at § 170.2(a)(2) & (b). If promulgated, the Proposed Extension would extend this deadline to December 2, 2023.

52.    No experience waiver is available to expanded-home day-care caregivers.

### *Staff Qualifications Under the Rulemaking: Expanded-Home Day-Care Assistant Caregivers*

53.    As a result of the Rulemaking, assistant caregivers in expanded-home day cares must have at least one year of experience working in a licensed home day care or in a licensed day-care center; a high-school diploma or its equivalent; and obtain a CDA by December 2, 2018. *See id.* at § 171.1. If promulgated, the Proposed Extension would extend this deadline to December 2, 2019.

54.    No experience waiver is available to expanded-home day-care assistant caregivers.

### *Staff Qualifications Under the Rulemaking: Home Day-Care Caregivers*

55.    As a result of the Rulemaking, caregivers in home day cares must have a high-school diploma or its equivalent and obtain a CDA by December 2, 2018. *See id.* at § 168.1. If promulgated, the Proposed Extension would extend this deadline to December 2, 2019.

56.    No experience waiver is available to home day-care caregivers.

### *The Hardship Waiver*

57.     In addition to the experience waiver, OSSE may waive compliance with

provisions of its day-care licensing regulations if "demonstrated immediate economic impact or

hardship on the Facility or staff member is sufficiently great to make immediate compliance

impractical despite diligent efforts" (a "hardship waiver"). *Id.* at § 106.1(a). Additionally, the

"[f]acility or staff member [must] meet[] or exceed[] the intent of the regulation for which the

waiver is requested." *Id.* at §106.1(b). Finally, the "health and welfare of staff and children [must

not be] jeopardized." *Id.* at § 106.1(c).

58.     Upon information and belief, OSSE has not publicly announced what constitutes

"demonstrated immediate economic impact or hardship" or "diligent efforts" to comply with the

day-care licensing regulations.

59.     To grant a hardship or experience waiver, OSSE must make factual findings

"upon clear and convincing evidence." *See id.* at §106.1.

60.     OSSE issues hardship and experience waivers at its discretion, and they can be

revoked at any time upon violation of any condition attached to the waiver or upon OSSE's

determination that the waiver is not in the best of interest of children. *See id.* at § 106.5.

61.     Upon information and belief, on May 31, 2017, Elizabeth Groginsky, Assistant

Superintendent of Early Learning at OSSE, publicly stated at a meeting with day-care providers

and their employees that waiver applications would not be available until the college requirement

was "closer" to coming into effect—2019 for expanded-home day-care caregivers who need an

associate's degree and 2020 for day-care center teachers who need an associate's degree.

### *OSSE's Pre-service Training, Orientation Training, and Ongoing Professional Development*

62.  OSSE also requires (and has always required, even before the Rulemaking) pre-service training, orientation training, and ongoing professional development for all of its day-care staff. *See id.* at § 139.

63.  OSSE's pre-service training takes place within 30 days of an employee's hiring date and covers health and safety standards, including (at minimum) child abuse and neglect, prevention, detection, and reporting; emergency preparation; prevention of sudden infant death syndrome and use of safe sleep practices; prevention of shaken baby syndrome and abusive head trauma; and first aid and CPR. *See id.* at § 139.2.

64.  OSSE's orientation training takes place within 90 days of an employee's hiring date and covers additional health and safety standards, including (at minimum) developmentally appropriate programming for infants, toddlers, preschool, and/or school-age children; prevention and control of infectious diseases, including immunization; administration of medication; prevention of and response to emergencies due to food and allergic reactions; building and physical premises safety; and poison prevention, including the handling and storage of hazardous materials and disposal of bio-contaminants. *See id.* at § 139.3.

65.  Day-care staff responsible for transporting children also receive additional orientation training from OSSE. *See id.* at § 139.5.

66.  Staff members who provide direct care for children must be supervised until they receive training in pediatric first aid and CPR, safe sleep practices, standard precautions to prevent communicable disease, poison prevention, and shaken baby syndrome and abusive head trauma. *See id.* at § 139.4.

67.     OSSE's ongoing, annual professional development keeps day-care staff updated on the topics included in their pre-service and orientation training. *See id.* at § 139.7.

68.     OSSE's annual professional development may also include classes about developmentally appropriate programming, methods of positive behavior intervention and support, inclusion of children with special needs, communication with families, community health and social service resources, enhancing children's self-regulation and self-esteem, Montessori curriculum (if applicable), basic or advanced business practices, and any other area determined by OSSE. *See id.* at § 139.8.

69.     Day-care providers can receive their pre-service training, orientation training, and annual professional development in seminars, in-person or online courses, workshops, conferences, or association meetings. These programs must be conducted by an OSSE-approved trainer or by an institution accredited by the U.S. Department of Education or the Council for Higher Education Accreditation. *See id.* at § 139.9.

70.     All day-care center staff must participate in at least 21 hours of professional development annually. *Id.* at § 139.6(a).

71.     All expanded-home day-care caregivers and staff must participate in at least 15 hours of professional development annually. *Id.* at § 139.6(c).

72.     All home day-care caregivers and staff must participate in at least 12 hours of professional development annually. *Id.* at § 139.6(b).

### *Penalties for Violating OSSE's Day-Care Licensing Regulations*

73.     OSSE may summarily suspend any day-care facility's license for up to 45 days upon a finding that circumstances present "an imminent danger to the health, safety, or welfare

14

of children, adults, or the general public." *Id.* at § 114.1. An "imminent threat" may include "inadequate staffing." *Id.* at § 114.3.

74.     Violations of OSSE's day-care licensing regulations are punishable by civil fines and/or by criminal penalties of up to $300 or six months in prison. *See id.* at § 116.

### OSSE Promulgated the College Requirement Via Rulemaking With No Oversight

75.     OSSE conducted the Rulemaking without oversight from D.C.'s City Council.

76.     OSSE was not required by law to send the Rulemaking to the D.C. City Council for review at any point in the process.

77.     Upon information and belief, OSSE did not send the Rulemaking to the D.C. City Council for review.

78.     Upon information and belief, OSSE finalized and enacted the Rulemaking without any sort of oversight from the D.C. City Council.

79.     At the time of the Rulemaking, no statute or other law provided for City Council oversight or judicial review of OSSE's rulemakings regarding day cares.

80.     OSSE cites its establishing statute, among other laws, as a source of the agency's authority to promulgate the Rulemaking. *See* OSSE Notice of Final Rulemaking, 63 D.C. Reg. 14640 (citing Establishment of the Office of the State Superintendent of Education, D.C. Code §§ 38-2602(b)(6A), (b)(9), (b)(9A), (b)(11)).

81.     OSSE's establishing statute does not contain any provision subjecting the agency's rulemakings to review by the D.C. City Council.

82.     OSSE's establishing statute does not contain any provision subjecting the agency's rulemakings to judicial review by a court. When federal administrative agencies (which, like D.C. agencies, derive their power from Congress) engage in rulemaking, their

actions are subject to judicial review under the federal Administrative Procedure Act. *See* 5 U.S. Code § 706. In contrast, the District's Administrative Procedure Act provides for judicial review in the D.C. Court of Appeals only in "contested cases," which do not include rulemakings. D.C. Code § 2-510.

83.     OSSE's authority to enact rulemakings regarding day-care licensing also originates with the Child Development Facilities Regulation Act of 1998 (the "Facilities Act"), D.C. Code §§ 7-2031 *et seq.* The Facilities Act delegates rulemaking authority to implement the statute to the District's Mayor. *See id.* at § 7-2036(a)(1). This includes the authority to promulgate rules regarding "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training[.]" *Id.* at § 7-2036(a)(1)(A).

84.     The Mayor delegated rulemaking authority to implement the Facilities Act to OSSE through a July 16, 2009 Mayor's Order. *See* Mayor's Order 2009-130, https://www.dcregs .dc.gov/Common/NoticeDetail.aspx?noticeId=3440.

85.     Neither the Facilities Act nor the Mayor's July 16, 2009 Order provide any intelligible principle to guide OSSE's rulemaking with respect to day-care provider educational requirements. Moreover, because the Rulemaking is not a "contested case" and there is no opportunity for judicial review, there is no mechanism for a court (or anyone else) to evaluate whether OSSE's actual rulemaking is in keeping with any policies set out by the Facilities Act or the Mayor's July 16, 2009 Order.

86.     Because the Rulemaking is not a "contested case" and there is no opportunity for judicial review, OSSE was not required to regulate in a manner that was not arbitrary and capricious, contrary to law, in excess of its authority, or unsupported by substantial evidence.

87.     Because the Rulemaking is not a "contested case" and there is no opportunity for judicial review, when asked for a non-English translation of the proposed rulemaking during the notice and comment period, OSSE declined to create one. *See* Final Rulemaking at 4–5, D.C. Reg. 14643-44.

88.     At the time of the Rulemaking, the Facilities Act did not require rulemakings promulgated pursuant to the statute to be reviewed by the D.C. City Council.

89.     In June 2017, the D.C. City Council imposed a 30-day review period on all of OSSE's future rulemakings pursuant to the Facilities Act. *See* D.C. Act 22-71, Child Development Facilities Regulation Act of 2017, 64 D.C. Reg. 8558; D.C. Code § 7-2036(a)(2). During this review period, the D.C. City Council can disapprove proposed rulemakings under the Facilities Act.

90.     In June 2017, the D.C. City Council also ordered OSSE to conduct a study about the impact of the college requirement on day-care providers and the cost of child care in the District. *See* D.C. Act 22-72, Child Care Study Act of 2017, 64 D.C. Reg. 8559; D.C. Code § 7-2011.03.

91.     Upon information and belief, the D.C. City Council imposed the review period on OSSE's day-care rulemakings and ordered the study of the college requirement's costs in direct response to controversy over the college requirement.

92.     The prospective 30-day review period and study have absolutely no effect on OSSE's December 2, 2016 rulemaking, including the college requirement.

93.     OSSE's November 17, 2017 Proposed Extension is subject to the new 30-day D.C. City Council review period.

## The College Requirement's Impact on the District's Day-Care Providers and Parents

94.     As a result of the college requirement, hundreds of qualified day-care providers will be forced to obtain expensive, time-consuming, and largely irrelevant credentials in order to keep their jobs.

95.     Upon information and belief, it will be impossible for many day-care staff to comply with the college requirement.

96.     Upon information and belief, the time required to obtain an associate's degree is an insurmountable obstacle to many day-care providers who work full time and have other responsibilities such as caring for their own families.

97.     Upon information and belief, the money required to obtain an associate's degree is an insurmountable obstacle to many day-care staff who earn wages comparable to those of a fast-food cook.

98.     Upon information and belief, day-care staff in the District earn around $25,000 to $30,000 per year, and many do not receive health insurance or retirement benefits.

99.     Upon information and belief, many of the District's day-care providers are immigrants whose first language is not English.

100.    Upon information and belief, many immigrant day-care providers face an insurmountable language barrier to obtaining a college degree.

101.    Upon information and belief, there are no early-childhood associate's-degree programs available in Spanish in the D.C. metro area.

102.    Upon information and belief, non-English-speaking day-care providers who have no way to obtain a college degree because of a language barrier will lose their jobs when the college requirement comes into effect.

103.    Upon information and belief, there are many language-immersion day-care programs throughout the District.

104.    Upon information and belief, because the District's day-care licensing regulations require higher adult-to-child ratios for infants, care for this age range is the most expensive type of care for a D.C. day care.

105.    Upon information and belief, the District's universal pre-Kindergarten means that day cares cannot make up for the high cost of infant care by caring for less costly older children, because older children are in pre-Kindergarten instead of day care.

106.    Upon information and belief, the District's high rents and zoning rules make it difficult for day-care centers to open and stay operational.

107.    As of December 2019, expanded-home day cares run by caregivers without at least an associate's degree with a major in an early-childhood field will be subject to fines, criminal penalties, and summary closure by OSSE.

108.    As of December 2020, day-care centers that employ teachers without at least an associate's degree with a major in an early-childhood field or an associate's degree in any major with at least 24 credit hours in an early-childhood field will be subject to fines, criminal penalties, and summary closure by OSSE.

109.    Upon information and belief, at present, some day-care centers will not hire new teachers who do not have a college degree.

110.    Upon information and belief, the cost of child care in the District is higher than in any of the 50 states.

111.    Upon information and belief, in 2017, annual costs at a D.C. day-care center averaged $23,089 ($1,924 per month) for an infant.

112.    Upon information and belief, in 2017, the cost of infant care in a D.C. day care ($23,089) was nearly three times higher than the annual cost of college tuition at a four-year public college in the District, which was around $8,060.

113.    Upon information and belief, high day-care costs are a major factor driving people out of the District.

114.    Upon information and belief, waitlists at D.C. day cares can run over a year. Parents who get on a waitlist as soon as they are pregnant can still find themselves without a spot when the baby is born.

115.    Upon information and belief, many D.C. parents are forced to put their children in unlicensed care or to leave the workforce to take care of them.

116.    Upon information and belief, nannies in the District cost between $30,000 and $41,600 a year.

117.    During OSSE's notice and comment period for the Proposed Extension (which ran from November 17, 2017, to December 18, 2017), D.C. parents, day-care providers, and concerned citizens spoke out against the new regulations.

118.    D.C. parents, day-care providers, and concerned citizens submitted over 350 written comments opposing OSSE's new education requirements.

### There Is No Reason to Believe That a College Requirement for Day-Care Providers Will Help Children

119.    The Rulemaking provides no research or factual basis to support its college requirement.

120.    Based on OSSE officials' statements to the media, the college requirement was inspired by a 2015 report by the National Academies (the "NAS report"). *See* National

Academies Press, *Transforming the Workforce for Children Birth Through Age 8: A Unifying Foundation (2015)*, http://www.nationalacademies.org/hmd/Reports/2015/Birth-To-Eight.aspx.

121.    The NAS report recommends at minimum a bachelor's degree requirement for all "lead educators" working with children from birth through age eight. *See* NAS report, Recommendation 2, at 513.

122.    Because the District has universal pre-Kindergarten, day cares in the city serve almost exclusively children ages *zero to three*, not zero to eight.

123.    The NAS report states that there is no empirical support for requiring day-care providers to get college degrees and that there are many negative consequences to doing so.

124.    The NAS report states that "existing research on the relationship between the education level of educators and the quality of instruction or children's learning and development is inconclusive." NAS report at 434; *see also id.* at 6, 514.

125.    The NAS report repeatedly cautions that its recommendations did not take into account the many potential costs involved in requiring day-care providers to get college degrees: the money required to get the degree; the time required to get the degree while working full time; "workforce shortages, reduced diversity in the professions, increased disparities among current and future professionals, upward pressure on out-of-pocket costs to families, and disruptions to the sustainability of operating in the for-profit and not-for-profit care and education market." *See id.* at 7–8; 438.

126.    The NAS report separately recommends a complete overhaul of the existing education system for early-childhood providers, which means that the report recommends that governments require people to obtain degrees and credentials that *the report itself* says do not currently provide any uniform standard of education. *See id.*, Recs. 4 & 5, at 522–29.

127.    Associate's degrees are generalist degrees. Upon information and belief, the majority of courses necessary to obtain an associate's degree in an early-childhood field are completely unrelated to caring for children.

128.    Getting an associate's degree recommended by OSSE requires at least 61 semester credit hours (about 20 classes), the majority of which are completely irrelevant to caring for children. *See* OSSE website, Resources for Teachers, https://osse.dc.gov/page/teacher.

129.    Upon information and belief, Trinity University (a program recommended by OSSE) requires only five courses in an early-childhood field (15 credit hours) for an associate's degree with an "early childhood" emphasis, while 15 other courses (46 credit hours) include (aside from math and English, which are also required) "Logic and Problem Solving," "Introduction to Communication and Public Speaking," "Music and Culture," "Contemporary World History," "Politics and Citizenship," "Science of the Environment," and "Comparative Religions." *See* https://www.trinitydc.edu/thearc/program-guide/.

130.    Upon information and belief, an associate's degree from Trinity College costs about $45,000 in tuition alone (61 credits at $740 per credit) for a part-time student. *See* https://www.trinitydc.edu/enrollment/tuition-and-fees/#cas14.

131.    Upon information and belief, the University of the District of Columbia Community College (a program recommended by OSSE) requires 36 credit hours in early-childhood classes to obtain an associate's degree with a major in Infant/Toddler Education. *See* http://docs.udc.edu/pos/AAS%20Education-Option%201.pdf.

132.    Upon information and belief, the University of the District of Columbia Community College requires 26 credit hours of other coursework for its Infant/Toddler Education associate's degree, including two courses in college math, two courses in English

composition, "World Cultural Geography," and "Public Speaking." *See* http://docs.udc.edu/pos/ AAS%20Education-Option%201.pdf.

133.    Upon information and belief, an associate's degree from the University of the District of Columbia Community College costs about $10,000 to $15,000 for a part-time student living in the District or its metro area. *See* https://www.udc.edu/cc/fees/.

134.    Upon information and belief, Montgomery College (a program recommended by OSSE) requires only 15 semester credit hours in early-childhood classes to obtain an associate's degree with a major in early-childhood education or early-childhood special education. *See* http://catalog.montgomerycollege.edu/preview_program.php?catoid=8&poid=1699&returnto =1322.

135.    Upon information and belief, Montgomery College requires 48 semester credit hours of other coursework for its associate's degree in early-childhood education or early-childhood special education, including writing and math courses, biology, two courses in United States history, "Global Geography," "Probability, Statistics, and Problem Solving," two physical science courses, and "Personalized Health Fitness." *See* http://catalog.montgomerycollege.edu/ preview_program.php?catoid=8&poid=1699&returnto=1322.

136.    Upon information and belief, an associate's degree from Montgomery College costs about $10,000 to $26,000 for a part-time student, depending on residency. *See* http://www.montgomerycollege.edu/_resources/documents/paying-for-college/montgomery-college-tuition-fee-schedule-2017-2018.pdf.

### Plaintiff Altagracia Sanchez

137.    Plaintiff Altagracia Sanchez is 55 years old and originally from the Dominican Republic.

138.    In her home country, Plaintiff Sanchez obtained a doctoral degree in law at Universidad Autonoma de Santo Domingo and worked as an attorney.

139.    In search of a better life, Plaintiff Sanchez moved to the United States in 1995 and became a U.S. citizen in 2008.

140.    Since Plaintiff Sanchez moved to the United States, she has followed her passion by working with children. She has never attended college in the United States.

141.    Plaintiff Sanchez has two adult children. Her daughter just graduated from college and is about to pursue her master's degree. Her son is attending college now, and Plaintiff Sanchez is helping him pay for school.

142.    Plaintiff Sanchez worked in a D.C. day-care center for a few years after moving to the United States, and in 2002 she began working as a case worker at Mary's Center, which provides assistance to families and day-care providers in the District.

143.    In 2006, Plaintiff Sanchez obtained her CDA and opened an expanded-home day care in her home in Northeast D.C.

144.    Plaintiff Sanchez's expanded-home day care is called Mundo de Fantasias.

145.    Mundo de Fantasias is licensed for nine children. At present, Plaintiff Sanchez cares for nine children: four infants one year old or under; three two-year-olds; and two three-year-olds.

146.    Plaintiff Sanchez is the primary caregiver at her day care and qualifies as an "expanded-home caregiver" under the Rulemaking.

147.    She employs her daughter and one other person as assistant caregivers.

148.    Plaintiff Sanchez's daughter has a bachelor's degree in early-childhood studies, but she does not plan to work at her mother's day care permanently. Plaintiff Sanchez's other assistant caregiver has a CDA.

149.    Plaintiff Sanchez's husband cooks the food she serves to the children at the day care. Her husband also works as a doorman.

150.    Under OSSE's adult-to-child ratios, Plaintiff Sanchez's day care must have at least three caregivers. *See* D.C. Mun. Regs. tit. 5-A, § 121.3(c). This means that all three caregivers (including Plaintiff Sanchez) must be present at all times if nine children are at the day care.

151.    If all nine children are present, it is impossible for Plaintiff Sanchez to leave her day care without violating OSSE's adult-to-child ratios.

152.    Plaintiff Sanchez's day care operates on weekdays from 7:00 a.m. to 6:00 p.m., and sometimes children stay past 7:00 p.m.

153.    OSSE's college requirement presents Plaintiff Sanchez with only three options: (1) obtain an associate's degree with a major in an early-childhood field by December 2, 2019; (2) obtain a hardship waiver; or (3) face the inevitable loss of her job.

154.    Plaintiff Sanchez cannot apply for an experience waiver because no experience waivers are available to expanded-home caregivers.

155.    If Plaintiff Sanchez worked as a teacher in a day-care center, she would be eligible to apply for OSSE's experience waiver because she has more than ten years of experience running her expanded-home day care.

156.   As a result of the Proposed Extension, Plaintiff Sanchez does not know whether the deadline to obtain her degree is, in fact, December 2, 2019; or if it will be extended to December 2, 2023.

157.   Plaintiff Sanchez interprets OSSE's hardship waiver provision to mean that in order to qualify for a waiver, she would need to be taking steps to attend college now. This is because OSSE's regulations require her to make "diligent efforts" to comply with the day-care licensing regulations in order to receive a hardship waiver. D.C. Mun. Regs. tit. 5-A, § 106.1(a).

158.   OSSE has provided no guidance to Plaintiff Sanchez about the "diligent efforts" she would need to take in order to apply for a hardship waiver.

159.   Assuming Plaintiff Sanchez *could* attend college part-time (which she cannot), it would take her *at least* five years to obtain an associate's degree (around 60 credit hours) by taking two classes (around six credit hours) per semester.

160.   Plaintiff Sanchez would also need time to apply for financial aid and student loans.

161.   No matter when the deadline is, in order to comply with OSSE's new regulations (either by obtaining an associate's degree by an unknown deadline or by obtaining a hardship waiver), Plaintiff Sanchez would need to start attending college now.

162.   In addition to obtaining an associate's degree, Plaintiff Sanchez must complete at least 15 hours of OSSE-approved professional development annually.

163.   Plaintiff Sanchez's native language is Spanish. She can speak, read, and write English well enough to run her day care, but she cannot read or write English at a college level.

164.    Plaintiff Sanchez depends on the income from her day care to earn her living and help pay for her son's education. Plaintiff Sanchez cannot afford to shut down her day care in order to attend college.

165.    It is not realistic for Plaintiff Sanchez to attend college part time while working full time at her day care.

166.    If Plaintiff Sanchez had to attend college classes on weekday evenings, she would most likely be forced to violate OSSE's adult-to-child ratios regularly by leaving her day care while children were still present.

167.    Plaintiff Sanchez cannot afford to hire another employee for her day care.

168.    Plaintiff Sanchez cannot afford to go to college out of pocket, and she does not wish to take on debt to pay for college.

169.    Plaintiff Sanchez does not need an associate's degree to care for children at her day care lovingly and competently, which she has done for the past 11 years.

170.    Parents trust Plaintiff Sanchez to care for their children competently and lovingly.

171.    Working with children is Plaintiff Sanchez's passion. She loves running her day care and wishes to continue to do so for the foreseeable future until she retires.

### Plaintiff Dale Sorcher

172.    Plaintiff Dale Sorcher is a licensed clinical social worker with two master's degrees. She has a master's degree in social work from the Hunter School of Social Work and a master's degree in education in expressive therapy from Lesley College. Plaintiff Sorcher also has a bachelor of fine arts degree in dance from the University of Michigan.

173.    Plaintiff Sorcher works as a teacher at a Jewish preschool in Northwest D.C.

174.    The preschool serves children ages zero to three and is licensed by OSSE as a

day-care center. Plaintiff Sorcher does not care for any children older than three years old.

175.    The preschool is part of the synagogue where Plaintiff Sorcher grew up, and her

children were all active in the religious school and youth groups there. Plaintiff Sorcher has three

adult children: two attending college and one attending medical school.

176.    Plaintiff Sorcher's synagogue has separate programs for children ages 8 to 18

months, two years, three years, and four and five years.

177.    Plaintiff Sorcher's synagogue also has educational programs for elementary and

high-school students. These programs, called the "Religious School" and the "Ma'alot (High

School)," are not traditional, full-time education programs. Instead, they are morning, evening,

and weekend programs.

178.    Plaintiff Sorcher's preschool (including the day care) is accredited by the National

Association for the Education of Young Children.

179.    Plaintiff Sorcher's preschool (including the day care) does not provide

government-subsidized child care.

180.    From 1980 to 1991, Plaintiff Sorcher worked in New York City as a movement

therapist and clinical social worker. Plaintiff Sorcher moved to the District and began working

with toddlers at the synagogue in 1996, and then she left in 1999 to care for her children full

time.

181.    Plaintiff Sorcher returned to the school to care for toddlers in 2010. She is now a

teacher for the school's "parent/toddler" program and for two-year-olds. In the "parent/toddler"

program, parents also attend and play with their children.

182.    Plaintiff Sorcher qualifies as a day-care center "teacher" under the Rulemaking.

183.  Plaintiff Sorcher is passionate about her work with children and families at the synagogue.

184.  Plaintiff Sorcher also works as a licensed clinical therapist in the afternoons.

185.  Plaintiff Sorcher needs 40 hours of continuing-education units every two years to maintain her social-work licenses in Maryland and the District.

186.  Plaintiff Sorcher also needs 21 hours of OSSE-approved continuing education per year to keep working in her role as a teacher at the preschool.

187.  There is no overlap between Plaintiff Sorcher's social work continuing-education classes and her continuing-education classes for OSSE, so she needs a total of 61 hours of continuing-education classes every year.

188.  OSSE's college requirement presents Plaintiff Sorcher with only four options: (1) go back to college to obtain 24 credit hours in an early-childhood field by December 2, 2020; (2) obtain a hardship waiver; (3) obtain an experience waiver; or (4) face the inevitable loss of her job.

189.  If Plaintiff Sorcher did not have a degree already, she would only need to obtain an associate's degree with a *major* in an early-childhood field. As shown above in paragraphs 129 and 134, Plaintiff Sorcher could obtain an associate's degree in an early-childhood field in the District by taking *fewer* than 24 semester credit hours of early-childhood classes.

190.  As a result of the Proposed Extension, Plaintiff Sorcher does not know whether the deadline to obtain her college credits is, in fact, December 2, 2020; or if it will be extended to December 2, 2023.

191.    No matter when the deadline is, Plaintiff Sorcher would need to immediately begin searching for college programs that would meet her scheduling needs to determine (among other things) how much money she would need to set aside for tuition.

192.    Plaintiff Sorcher interprets OSSE's hardship waiver provision to mean that in order to qualify for a waiver, she would need to be taking steps to attend college now. This is because OSSE's regulations require her to make "diligent efforts" to comply with the day-care licensing regulations in order to receive a hardship waiver. D.C. Mun. Regs. tit. 5-A, §106.1(a).

193.    OSSE has provided no guidance to Plaintiff Sorcher about the "diligent efforts" she would need to take in order to apply for a hardship waiver.

194.    Plaintiff Sorcher is not eligible for OSSE's ten-year experience waiver because her years of experience are not "continuous." She had only worked "continuously" at her position since 2010, a total of about six years, up until the Rulemaking went into effect on December 2, 2016.

195.    On June 30, 2017, Plaintiff Sorcher received an email from her director about OSSE's new regulations. This email laid out OSSE's new college requirement and expressed that it would adversely affect many of the preschool's staff.

196.    Soon after she received the email, Plaintiff Sorcher met with her director about OSSE's new regulations. Her director expressed the desire to retain Plaintiff Sorcher as a teacher and mistakenly reassured her that she would be able to apply for an experience waiver. Plaintiff Sorcher pointed out that she is ineligible for an experience waiver because her years of experience are not "continuous."

197.    Between her two jobs and annual professional development, Plaintiff Sorcher does not have time to go back to college.

198.    Plaintiff Sorcher does not need more education to take care of children competently and lovingly, as she has done continuously for the past eight years and for years before that during her previous job at the preschool.

199.    Parents trust Plaintiff Sorcher to care for their children competently and lovingly.

200.    Plaintiff Sorcher wishes to continue to follow her passion and work as a teacher at her preschool until she retires.

### Plaintiff Jill Homan

201.    Plaintiff Jill Homan lives in Petworth with her family. She owns a commercial real-estate investment firm.

202.    Plaintiff Homan and her partner have a one-year-old daughter.

203.    Plaintiff Homan and her partner work full time and need care for their daughter during the day.

204.    Since June 2017, Plaintiff Homan has taken her daughter to a day-care center in Northeast D.C. to spend full days each weekday.

205.    Plaintiff Homan and her partner pay $1,700 per month for their daughter's day care.

206.    Plaintiff Homan's friends in the District pay anywhere from $1,500 to $2,000 per month for day care.

207.    Plaintiff Homan and her partner work hard to make their budget work and spent a great deal of time researching and coming up with a child-care solution that met their family's needs.

208.    Plaintiff Homan did not have to spend time on a waitlist for a spot in her daughter's day care, but only because she paid a nonrefundable deposit of $2,575 for a spot in a

new facility. Plaintiff Homan paid this deposit on September 24, 2016—almost two months before her daughter was born. The day care was supposed to open in January 2017 but did not open until June due to permitting delays.

209.    Plaintiff Homan trusts the director and staff of her daughter's day care and has been pleased with the care they have provided for her. The staff regularly gives Plaintiff Homan and her partner parenting tips.

210.    Plaintiff Homan is confident that her daughter is receiving exceptional care.

211.    Plaintiff Homan's daughter loves her caregivers.

212.    Many of the staff at Plaintiff Homan's day care, including some who directly care for her daughter, do not have the college degree required by OSSE's new regulations.

213.    It does not make a difference to Plaintiff Homan whether the people who care for her daughter have a college degree. Rather, Plaintiff Homan prioritizes love, caring, patience, and attentiveness in her daughter's caregivers.

214.    OSSE's new regulations have worried Plaintiff Homan and other parents, because she is afraid that the caregivers she trusts will not be able to comply with the college requirement and will lose their jobs.

215.    Plaintiff Homan and other parents also worry that day-care providers who are exhausted, stressed, and overwhelmed by having to attend college, work full time, and care for their own families, will provide worse care than those who do not have to worry about attending school.

216.    Plaintiff Homan and other parents also worry that day care will become more expensive because of the college requirement.

**Injury to Plaintiffs**

217.    Before OSSE enacted the college requirement, Plaintiffs Sanchez and Sorcher did not need a college degree to work at a day care.

218.    Because of the college requirement, Plaintiff Sanchez's expanded-home day-care license will be revoked when the rule comes into effect.

219.    Because of the college requirement, Plaintiff Sorcher's employer will be subject to fines and criminal penalties if it continues to employ her when the rule comes into effect.

220.    If not for the college requirement, Plaintiff Homan would be free to choose caregivers who do not have a college degree.

221.    If not for the college requirement, Plaintiff Homan would not have to worry that her daughter's caregivers will be exhausted, stressed, and overwhelmed by attending school while working full time and taking care of their own families.

222.    Whether the deadline is next year or 2023, the eventual implementation of the college requirement is inevitable.

223.    The inevitable implementation of the college requirement is causing Plaintiffs real harm today.

224.    For example, to comply with the college requirement by 2023, Plaintiff Sanchez would immediately need to apply for financial aid and student loans and start attending at least two college classes per semester.

225.    Similarly, if Plaintiff Sorcher will be required to obtain an additional 24 credit hours of college education, she would need to immediately begin searching for college programs that would meet her scheduling needs in order to determine (among other things) how much money she would need to set aside for tuition.

226.    OSSE's college requirement is causing and will continue to cause ongoing and irreparable harm to Plaintiffs.

227.    A declaratory judgment in their favor in this action would allow Plaintiffs to avoid these harms.

## CONSTITUTIONAL VIOLATIONS

### Count I
### (Article I, Section 8, clause 17 of the U.S. Constitution and the D.C. Home Rule Act: Unconstitutional Delegation)

228.    All preceding allegations are incorporated here as if set forth in full.

229.    The Constitution gives Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17.

230.    Congress's power to delegate its legislative authority is limited by the Constitution and the Administrative Procedure Act. *See* 5 U.S.C. § 706.

231.    Congress has delegated limited legislative power to the District's City Council under certain conditions explained below. Because its power comes from Congress, the D.C. City Council's authority to further delegate that power is subject to the same constitutional restraints as Congress's power to delegate.

232.    The D.C. City Council may not bypass the constitutional limits on its power to legislate by delegating unfettered authority to an administrative agency such as OSSE.

233.    In 1973, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act (the "D.C. Home Rule Act"). D.C. Code §§ 1-201.01–1.207.71. The D.C. Home Rule Act delegated some, but not all, of Congress's legislative authority over the District to the D.C. City Council. *Id.* at § 1-203.02.

234. The D.C. Home Rule Act places limits on the D.C. City Council's legislative authority. For example, Congress retains the ability to enact legislation for the District on any subject or repeal any act of the D.C. City Council. *Id.* at § 1-206.01. The D.C. City Council's acts are also subject to a 30-day congressional layover period. *See* D.C. Code § 1-206.02(c)(1).

235. At the time OSSE promulgated the Rulemaking, the agency's rulemaking authority to enact day-care licensing regulations was not subject to any oversight from Congress.

236. At the time OSSE promulgated the Rulemaking, the agency's rulemaking authority to enact day-care licensing regulations was not subject to any oversight from the D.C. City Council.

237. The Rulemaking is not subject to judicial review under the D.C. Administrative Procedure Act. There is no means by which a court may determine whether, at the time of the Rulemaking, OSSE was regulating without an intelligible principle, arbitrarily and capriciously, contrary to constitutional right, or contrary to substantial evidence.

238. Article I, Section 8, clause 17 of the Constitution and the D.C. Home Rule Act prohibit the D.C. City Council from delegating complete, unreviewable legislative discretion to administrative agencies.

239. OSSE exercised complete, unreviewable legislative discretion in promulgating the Rulemaking because it was not subject to oversight from the D.C. City Council, and the Rulemaking cannot be reviewed by a court to determine whether OSSE was regulating without an intelligible principle, arbitrarily and capriciously, contrary to constitutional right, or contrary to substantial evidence.

240. Therefore, OSSE's December 2, 2016 Final Rulemaking is invalid under Article I, Section 8, clause 17 of the U.S. Constitution and the D.C. Home Rule Act.

## Count II
### (Fifth Amendment to the U.S. Constitution: Due Process)

241.    All preceding allegations are incorporated here as if set forth in full.

242.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution protects

Plaintiffs Sanchez's and Sorcher's right to pursue an honest living free from arbitrary and

irrational regulations and Plaintiff Homan's right to make responsible decisions about whom to

trust to care for her child. The Amendment provides that no person shall "be deprived of life,

liberty, or property, without due process of law." U.S. Const. amend. V.

243.    The District's college requirement for day-care providers —specifically, D.C.

Mun. Regs. tit. 5-A, §§ 165 and 170—does not further any valid public health or safety purpose,

and therefore violates Plaintiffs' right to due process of law on its face and as applied.

244.    There is no rational basis for prohibiting someone from working in a day care

because she does not have a college degree.

245.    Unless Defendants are enjoined from enforcing the college requirement for day-

care providers, Plaintiffs will continue to suffer great and irreparable harm.

## Count III
### (Fifth Amendment to the U.S. Constitution: Equal Protection)

246.    All preceding allegations are incorporated here as if set forth in full.

247.    The Fourteenth Amendment to the U.S. Constitution provides that no state shall

"deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV. The Due Process Clause of the Fifth Amendment also guarantees equal protection. *Bolling*

*v. Sharpe*, 347 U.S. 497, 499 (1954).

248.    The Rulemaking draws an arbitrary and irrational distinction between day-care

providers, who are required to work for a licensed facility and to obtain a college degree to care

36

for children, and other kinds of child-care providers, such as nannies, who are allowed to care for children without being licensed or obtaining a college degree.

249.    The District's college requirement for day-care center teachers—specifically, D.C. Mun. Regs. tit. 5-A, § 165—draws an arbitrary and irrational distinction between private, parochial, and independent schools with full-time elementary or secondary education programs with day cares attached, which are exempt from the requirement, D.C. Mun. Regs. tit. 5-A, § 165.6; and private, parochial, and independent schools with attached day cares (such as Plaintiff Sorcher's synagogue) that serve elementary and secondary-school age children in other capacities. Moreover, private schools with full-time pre-Kindergarten through 12th-grade programs are exempt from day-care licensing altogether under D.C. Mun. Regs. tit. 5-A, § 101.5(l).  If Plaintiff Sorcher's synagogue served the same elementary- and secondary-school-age children full time, the day care would be exempt from licensure and from OSSE's college requirement.

250.    The District's college requirement for day-care providers —specifically, D.C. Mun. Regs. tit. 5-A, §§ 165 and 170—draws an arbitrary and irrational distinction between day-care center providers and expanded-home day-care providers. Day-care center teachers with ten years of continuous experience may apply for an experience waiver, while expanded-home caregivers with ten years of continuous experience (such as Plaintiff Sanchez) may not apply for an experience waiver.

251.    The District's college requirement for day-care center teachers—specifically, D.C. Mun. Regs. tit. 5-A, § 165—also draws an arbitrary and irrational distinction between day-care center teachers who already have a college degree and those who do not. Day-care center teachers who *already have* a college degree in a major other than an early-childhood field (such

as Plaintiff Sorcher) must obtain *at least 24* semester credit hours in an early-childhood field. Day-care center teachers who do *not* have a degree must obtain an associate's degree with a *major* in an early-childhood field, which may require *less than 24* semester credit hours of early-childhood classes. The Rulemaking requires *more* early-childhood courses for day-care providers *who already have college degrees* than for those who do not.

252.     There is no rational basis for prohibiting someone from working in a day care because she does not have a college degree.

253.     Unless Defendants are enjoined from enforcing the college requirement for day-care providers, Plaintiffs will continue to suffer great and irreparable harm.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request relief as follows:

A.     A declaratory judgment that OSSE's December 2, 2016 Final Rulemaking violates Article I, Section 8, clause 17 of the U.S. Constitution;

B.     A declaratory judgment that OSSE's December 2, 2016 Final Rulemaking violates the D.C. Home Rule Act;

C.     A declaratory judgment that sections 165 and 170 of Chapter 1, Child Development Facilities: Licensing, of Title 5-A of the District of Columbia Municipal Regulations, D.C. Mun. Regs. tit. 5-A, §§ 165 & 170, violate Plaintiffs' right to due process under the Fifth Amendment to the U.S. Constitution;

D.     A declaratory judgment that OSSE's December 2, 2016 Final Rulemaking violates Plaintiffs' right to equal protection of the laws under the Fifth Amendment to the U.S. Constitution;

E.      A declaratory judgment that sections 165 and 170 of Chapter 1, Child Development Facilities: Licensing, of Title 5-A of the District of Columbia Municipal Regulations, D.C. Mun. Regs. tit. 5-A, §§ 165 & 170, violate Plaintiffs' right to equal protection of the laws under the Fifth Amendment to the U.S. Constitution;

F.      A permanent injunction enjoining Defendants and their officers, employees, or agents from implementing, applying, or taking any action whatsoever pursuant to OSSE's December 2, 2016 Final Rulemaking and D.C. Mun. Regs. tit. 5-A, §§ 165 and 170;

G.      An award of nominal damages in the amount of $1 to each Plaintiff;

H.      An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

I.      All further legal and equitable relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this 26th day of April, 2018.

_____
Renée D. Flaherty (DC Bar No. 1011453)
Robert McNamara (VA Bar No. 73208)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Telephone:  (703) 682-9320
Facsimile:  (703) 682-9321
Email:  rflaherty@ij.org; rmcnamara@ij.org

*Attorneys for Plaintiffs*
*application for admission *pro hac vice* filed
concurrently with this document