# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ALTAGRACIA SANCEZ, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-975 (RC) |
| | : | | |
| v. | : | Re Document No.: | 9 |
| | : | | |
| OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

# MEMORANDUM OPINION

### GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

Together, the doctrines of standing, ripeness, and mootness serve a common purpose: to ensure that federal courts resolve only "Cases" and "Controversies" within the meaning of the Constitution. U.S. Const. art. III, § 2. This case presents the Court with questions involving all three doctrines. The case arises out of regulations promulgated in 2016 by the D.C. Office of the State Superintendent of Education ("OSSE") that impose minimum education requirements on certain childcare providers that operate in Washington. Plaintiffs are two childcare providers and one parent who bring a number of challenges to those education requirements. As the Court will explain below, however, it is unable to reach the merits of Plaintiffs' challenges at this juncture. The parent Plaintiff, who is not herself subject to the regulations, lacks standing because her asserted injuries are merely conjectural. The childcare provider Plaintiffs' claims, meanwhile, are either moot or unripe. This is because when OSSE first promulgated the regulations, it provided that the education requirements would not take effect for many years and that waivers would be available under certain circumstances. These protections were then expanded after

Plaintiffs initiated this lawsuit. Consequently, as things currently stand, both Plaintiffs will be permitted to continue working as childcare providers until December 2023, and they may seek waivers in the interim. Because this state of affairs leaves Plaintiffs' challenges unfit for judicial adjudication at this time, the Court dismisses their claims without prejudice.

## II. BACKGROUND

Housed within the Executive Office of the Mayor, OSSE "serve[s] as the state education agency" for the District of Columbia, D.C. Code § 38-2601.01, and is authorized to "formulate and promulgate rules necessary to carry out its functions," *id.* § 38-2602(b)(11). This authority includes the power to regulate "staff qualification[s]" at any "child development facility," *id.* — defined as a "center, home, or other structure that provides care and other services, supervision, and guidance for children, infants, and toddlers on a regular basis" but is not "a public or private elementary or secondary school engaged in legally required educational and related functions or a pre-kindergarten education program," *id.* § 7-2031(3). *See id.* § 7-2036(a)(1)(A) (delegating regulatory power to Mayor); Mayor's Order 2009-130, 56 D.C. Reg. 6883 (July 16, 2009) (Mayor in turn delegating power to OSSE).

Pursuant to its mandate, OSSE issued regulations on December 2, 2016 that set minimum education requirements for childcare staff at these child development facilities. *See generally* 63 D.C. Reg. 14,640–14,813 (Dec. 2, 2016). The requirements did not become immediately binding for most childcare professionals, though; depending on the kind of staff position at issue, the new regulations generally provided a grace period of anywhere between three and six years. *See, e.g.*, 63 D.C. Reg. 14,786, 14,799 (original versions of D.C. Mun. Regs. tit. 5-A1, §§ 164.1(b), (c) and 170.2(a)(1)(2)). And the regulations provided that OSSE could waive compliance with any of the education requirements if it was presented with clear and convincing

2

evidence that (1) "[t]he demonstrated . . . economic impact or hardship on the Facility or staff member [was] sufficiently great to make immediate compliance impractical despite diligent efforts;" (2) "[t]he facility or staff member [was] meeting or exceeding the intent of the regulation for which the waiver [was] requested; and" (3) "[t]he health and welfare of staff and children [we]re not jeopardized." D.C. Mun. Regs. tit. 5A-1, § 106.1. The regulations also provided that certain types of staff positions, though not all, would be subject to experience waivers, available to individuals who had, as of December 2016, "continuously served" in the relevant staff position for ten or more years. *Id.* §§ 164.3, 165.4.

Two of the three Plaintiffs in this case are subject to the new education requirements. Plaintiff Altagracia Sanchez is what the regulations deem an "expanded home caregiver." *See generally id.* §§ 169–71. Since 2006, she has run a licensed daycare out of her house, which currently cares for nine children. Compl. ¶¶ 143–45, ECF No. 1. Originally from the Dominican Republic, Sanchez has a law degree from the Universidad Autonoma de Santo Domingo. Compl. ¶¶ 137–38. But Sanchez never went to college in the United States, so when the regulations first went into effect, they required her to obtain by December 2, 2019 an "associate's or more advanced degree from an institution accredited by an agency recognized by the U.S. Secretary of Education or the Council for Higher Education Accreditation, with a major in early childhood education, early childhood development, child and family studies or a closely related field." 63 D.C. Reg. 14,799 (original version of D.C. Mun. Regs. tit. 5-A1, § 170.2); *see also* Compl. ¶¶ 153–54. Such a degree would require roughly sixty credit hours of classes, which according to Sanchez, would take at least five years for her to earn as a part-time student. Compl. ¶ 157. Sanchez's only other option at the time the regulations first took effect was to seek a hardship waiver, as the regulations did not make experience waivers available to

3

expanded home caregivers. *See* 63 D.C. Reg. 14,799 (original version of D.C. Mun. Regs. tit. 5-A1, § 170.2).

Plaintiff Dale Sorcher is what the regulations refer to as a "teacher in a child development center." *See* D.C. Mun. Regs. tit. 5A-1, § 165. She works with children up to the age of three at a licensed daycare center associated with a Jewish preschool. Compl. ¶¶ 173–78. Sorcher already has a bachelor's degree and two master's degrees, but none of them are in a field related to early childhood. As first promulgated, the OSSE regulations did make experience waivers available to childhood development center teachers, but Sorcher had only six years of continuous experience as a teacher as of December 2016. *See* 63 D.C. Reg. 14,791 (original version of D.C. Mun. Regs. tit. 5-A1, § 165.4); Compl. ¶ 194. Consequently, the regulations required her to obtain twenty-four college credit hours related to early childhood by December 2, 2020, or seek a hardship waiver. *See* 63 D.C. Reg. 14,791 (original version of D.C. Mun. Regs. tit. 5-A1, § 165.4).

Unlike Sanchez and Sorcher, the third Plaintiff, Jill Homan, is not herself subject to OSSE's regulations. Homan is a consumer of childcare services rather than a provider: her young daughter attends a licensed daycare center where the staff members will need to meet OSSE's new education requirements. Compl. ¶¶ 204, 212. Homan "is afraid that the caregivers she trusts will not be able to comply with the college requirement and will lose their jobs." Compl. ¶ 214. And she worries "that day-care providers who are exhausted, stressed, and overwhelmed by having to attend college, work full time, and care for their own families . . . will provide worse care than those who do not have to worry about attending school." *Id.* ¶ 215.

The three Plaintiffs brought this lawsuit against OSSE and the District of Columbia itself in April 2018. Seeking declaratory and injunctive relief, the complaint alleged that the education

4

requirements (1) exceeded the authority lawfully delegated to OSSE; (2) violated their Fifth Amendment substantive due process rights to pursue honest livings and make reasonable childcare choices; and (3) drew "arbitrary and irrational" distinctions between childcare providers, in violation of the Fifth Amendment's guarantee of equal protection. Compl. ¶¶ 228–53. When the complaint was filed, neither Sanchez nor Sorcher had applied for a hardship waiver because their understanding was that OSSE would not make the waiver applications "available until the college requirement was 'closer' to coming into effect—2019 for expanded-home day-care caregivers . . . and 2020 for day-care center teachers." *Id.* ¶ 61. In the meantime, Sanchez and Sorcher claimed that they would need to begin enrolling in college courses immediately in order to give themselves a chance of meeting their respective deadlines—December 2019 for Sanchez and December 2020 for Sorcher.

In June 2018, however, after Plaintiffs filed their complaint, OSSE amended its regulations to extend both of these deadlines to December 2023. 65 D.C. Reg. 7034–7036 (June 29, 2018); *see also* D.C. Mun. Regs. tit. 5-A1 §§ 165.1(d), 170.2(a)(2). The amendments also made experience waivers available to expanded home caregivers like Sanchez. 65 D.C. Reg. 7037; *see also* D.C. Mun. Regs. tit. 5-A1 § 170.2(c). Relying heavily on these changes to the regulations, Defendants responded to the complaint by filing a motion to dismiss, in which they argue primarily that the Court lacks subject matter jurisdiction because Plaintiffs do not have standing. But according to Defendants, even if Plaintiffs do have standing, the complaint still fails to adequately state a claim. Each of these reasons, Defendants say, independently require the Court to dismiss Plaintiffs' claims with prejudice.

5

## III. ANALYSIS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, courts must dismiss any claim over which they lack subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Rule 12(b)(6), by contrast, requires courts to dismiss any claim upon which relief could not be granted even if jurisdiction was proper. Fed. R. Civ. P. 12(b)(6). When these two rules are invoked together, a court must first address the issues encompassed by Rule 12(b)(1), as those issues implicate the court's ability to hear the case at all. *See, e.g.*, *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 64–65 (D.D.C. 2011).

That ability is strictly constrained; "[i]t is . . . presumed that a cause lies outside [federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). In deciding whether the plaintiff has met this burden, courts "'accept as true all of the factual allegations contained in the complaint' and draw all reasonable inferences" in the plaintiff's favor. *Schmidt*, 826 F. Supp. 2d at 65 (quoting *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008)). But courts need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 44 (D.D.C. 2017) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)). And the allegations in the complaint actually "'bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim," *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350). Indeed, because courts "have an independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), they are not limited to the arguments

raised by the parties when considering a Rule 12(b)(1) motion, and they are free to consider materials outside of the pleadings, *see, e.g.*, *Jerome Stevens Pharms. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Among the issues properly considered in the context of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction are the doctrines of standing, mootness, and ripeness. All three originate out of Article III's requirement that federal courts entertain only "cases" or "controversies." *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). It "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)).

Ripeness, on the other hand, focuses primarily "on the timing of the action rather than on the parties seeking to bring it." *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997). By counseling against "premature adjudication," it is meant "to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). Ripeness is not entirely distinct from Article III standing, though; part of the doctrine overlaps with standing, which, as discussed in greater detail below, requires

that the plaintiff's alleged injury be either *actual* or *imminent*. *See, e.g.*, *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). "In other words, if a threatened injury is sufficiently 'imminent' to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996). But ripeness then contains a non-constitutional, non-jurisdictional component. "Even if a case is constitutionally ripe, . . . there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Am. Petroleum Inst.*, 683 F.3d at 386 (internal quotation marks omitted) (quoting *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808). This "doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once." *Id.* at 387.

Finally, mootness, like ripeness, also implicates the timing of the action. Mootness's primary concern is not prematurity, however. Mootness instead occurs when the issues presented in a case "are no longer live or the parties lack a legally cognizable interest in the outcome." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008)). "This occurs when, among other things, the court can provide no effective remedy because a party has already 'obtained all the relief that [it has] sought." *Id.* (alteration in original) (quoting *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984)).

Here, Defendants made no mention of mootness or ripeness in their initial motion to dismiss; they argued only that Plaintiffs lack standing. But mootness and ripeness are addressed in Plaintiffs' opposition and Defendants' reply, and as the Court has already said, it has an independent obligation to ensure that jurisdiction is proper. *Arbaugh*, 546 U.S. at 514; *see also Nat'l Park Hosp. Ass'n*, 538 U.S. at 808 ("[E]ven in a case raising only prudential concerns, the

question of ripeness may be considered on a court's own motion."). All three doctrines are therefore properly before the Court.

## A. Standing

The Court begins its discussion with standing, as it represents Defendants' primary argument for dismissal, and because, unlike ripeness and mootness, "[s]tanding is assessed 'on the facts as they exist[ed] when the complaint [was] filed.'" *Cause of Action Inst. v. Tillerson*, 285 F. Supp. 3d 201, 205 (D.D.C. 2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569, n.4 (1992)). To have standing, "(1) [Plaintiffs] must have suffered an injury in fact that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) the injury must be 'fairly traceable to the challenged action of [Defendants]'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *N.B. ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (D.C. Cir. 2012) (quoting *Defenders of Wildlife*, 504 U.S. at 560–61). Where, as here, the lawsuit challenges the legality of government action, the nature of the standing inquiry depends largely on "whether the plaintiff is himself an object of the action . . . at issue." *Defenders of Wildlife*, 504 U.S. at 561. When a plaintiff is subject to the challenged regulation or policy, "there is ordinarily little question that the [government] action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Id.* at 561–62. But when a "plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed." *Id.* at 562. Standing in those cases is not foreclosed entirely, "but it is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

These general principles carry the day here: As childcare providers subject to the new education requirements, Sanchez and Sorcher have standing. Homan, on the other hand, who is

not subject to the OSSE regulations, has failed to make the requisite showing. Beginning with Sanchez and Sorcher, it is important to note that they do not merely assert that they may lose their jobs some time years down the road. Rather, they both allege that the new education requirements will force them to take action in the near future. Sanchez claims that even if she had the time and money to attend college part-time—which she says she does not—it would take her at least five years to obtain the necessary associate's degree. *See* Compl. ¶ 159. Sorcher similarly asserts that she "would need to immediately begin searching for college programs that would meet her scheduling needs to determine (among other things) how much money she would need to set aside for tuition." *Id.* ¶ 191.

These claims were plausible when the complaint was filed. Sanchez at that time had about a year and a half to, as a part-time student, earn sixty credit hours, which normally takes full-time students at least two years. Sorcher's task was somewhat easier—two and a half years to obtain twenty-four credits hours—but she too would be enrolled part-time. To meet the original deadline, she would need to enroll immediately and then take roughly three classes a year. Both Sanchez and Sorcher were technically eligible for hardship waivers, but they alleged that the waiver applications would be unavailable until 2019 or 2020. Compl. ¶ 61. By then, they would have had to begin taking (and paying for) classes.

In arguing that Sanchez and Sorcher lack standing, Defendants rely mostly on events that occurred after the complaint was filed. They argue, for example, that the amended regulations promulgated in June 2018 make it so Sanchez is now eligible for an experience waiver. *See* Mem. in Support of Defs.' Mot. to Dismiss ("Defs.' Mot. to Dismiss") at 8, ECF No. 9-1. And they contend that both Sanchez and Sorcher now have until December 2023 to earn the necessary college credits. *See, e.g.*, Defs.' Reply in Support of Mot. to Dismiss ("Defs.' Reply") at 3, ECF

No. 12.  This extension, Defendants contend, makes it so Sanchez's and Sorcher's injuries are no longer imminent.  But Defendants' arguments fail for purposes of standing because of a reason that the Court has already provided above: Standing is determined based on the facts as they existed at the time the complaint was filed—not on intervening circumstances.  *E.g.*, *Cause of Action Inst.*, 285 F. Supp. 3d at 205.  Here, when the complaint was filed, Sanchez had until December 2019 to earn the required degree, without the possibility of an experience waiver, and Sorcher had until December 2020.  Amendments to the regulations had been proposed, as the complaint itself acknowledges, *see* Complaint ¶¶ 40, 51, but those amendments were not law yet. Plaintiffs had to proceed based on what was law at the time.

On the facts as they existed when the complaint was filed, Sanchez's and Sorcher's injuries are concrete and particularized, as well as actual and imminent.  Those injuries are also traceable to Defendants' conduct, because in the absence of the OSSE regulations, Sanchez and Sorcher would not be legally required to take steps to enroll in college.  The injuries are redressable by a favorable decision too: if the Court were to enjoin enforcement of the regulations they would no longer need to enroll.  Thus, Sanchez's and Sorcher's claims, as alleged in the complaint, satisfy all three standing requirements.

The analysis for Homan is different, however, because she is unable to assert the same injuries.  Her alleged injuries are instead as follows:  First, she says that she is "worried . . . because she is afraid that the caregivers she trusts will not be able to comply with the college requirement and will lose their jobs."  *Id.* ¶ 214.  Second, she claims to "worry that day-care providers who are exhausted, stressed, and overwhelmed by having to attend college, work full time, and care for their own families . . . will provide worse care than those who do not have to

11

worry about attending school." *Id.* ¶ 215.  And third, she claims to "worry that day care will become more expensive because of the college requirement." *Id.* ¶ 216.

All three of these supposed injuries, like most asserted by individuals who are not themselves subject to the government action that they are challenging, depend on how non-parties will respond to the law or policy at issue—specifically here, how Homan's unnamed childcare providers will respond to OSSE's regulations.  *See Defenders of Wildlife*, 504 U.S. at 562.  In those cases where third-party choices are central, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."  *Id.*

Homan has not met that burden.  She has plead no specific facts showing that her childcare providers have responded or will respond to OSSE's regulations in the way that she claims.  Rather, by the terms of the complaint itself, her alleged injuries are nothing more than generalized "worrie[s]" about the regulations' possible effects.  *E.g.*, Compl. ¶ 214.  Indeed, crediting any one of Homan's claims of injury requires a great deal of speculation—speculation that her childcare providers will not be able to earn the credits; speculation that those providers will become tired and stressed and consequently provide worse care; or speculation that her chosen daycare center will choose to raise its prices as a result of the regulations.  Absent more specific factual allegations, the Court has no way of knowing whether any of these outcomes are likely to take place, and it is forced to conclude that Homan's injuries are merely "conjectural" and "hypothetical"—insufficient for purposes of standing.  *E.g.*, *DaimlerChyrsler*, 547 U.S. at 344.

Plus, even if Homan's claimed injuries were to occur, the Court would not know whether they were caused by the OSSE regulations so as to be redressable by injunctive relief.  *See, e.g.*,

*id.*; *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) ("When conjecture is necessary, redressability is lacking."). If, for example, her daycare center was to consider charging more, on what facts would the Court be able to infer that it was the result of the education requirements? And on what facts could the Court be confident that an injunction of the education requirements would prevent the daycare center from ultimately raising its prices? Or if Homan's childcare providers started showing signs of fatigue and stress, how would the Court know that it was due to their attempts to comply with the OSSE regulations? And how would the Court know that an injunction would ultimately lead them to feel restored and relaxed? That the Court is unable, based on the present iteration of the complaint, to answer these questions shows that Homan has not established any of the three standing requirements. The Court therefore lacks jurisdiction and must dismiss her claims.

The Court will not, however, at this juncture dismiss her claims *with prejudice*, as Defendants have requested. "Dismissal with prejudice is the exception, not the rule, in federal practice," *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012), and it "is warranted only when . . . the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency," *id.* (omission in original) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). Here, as the above discussion likely suggests, the Court doubts that Homan will ever be able to plead sufficient facts to establish standing, but the Court is not ready to call it impossible. And so, for now, dismissal will be only without prejudice.

### B. Mootness and Ripeness

Having concluded that Sanchez and Sorcher established standing based on the facts at the time the complaint was filed, the Court must next consider whether dismissal is warranted in light of subsequent events. As explained above, in June 2018, after Plaintiffs filed their

complaint, OSSE issued amendments to its regulations that are relevant here in two ways. First, the amendments gave Sanchez and Sorcher additional time to meet the education requirement: both deadlines were extended to December 2023. 65 D.C. Reg. 7034–7036; *see also* D.C. Mun. Regs. tit. 5-A1 §§ 165.1(d), 170.2(a)(2). Second, the amendments made home caregivers like Sanchez eligible for experience waivers.[1] 65 D.C. Reg. 7034–7036; *see also* D.C. Mun. Reg. tit. 5-A1 § 170.2(c).

These changes raise concerns related to both mootness and ripeness—which is admittedly somewhat odd. Ripeness, the Court has already explained, is usually concerned with lawsuits that were filed prematurely, *see, e.g.*, *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08, whereas mootness generally occurs when the suit was ripe at the time it was initiated but, due to intervening circumstances, the plaintiff "obtain[s] all the relief it has sought," making it so the

---

[1] It should be noted that the new provision providing experience waivers to expanded home caregivers contains an apparent typo. The provision states that those who have accumulated the requisite continuous time served "may submit an application to OSSE for a waiver of the qualification requirements in *Subsection 164.1*." D.C. Mun. Reg. tit. 5-A1 § 170.2(c) (emphasis added). But § 164.1 provides the qualification requirements for individuals employed as child development center directors—not expanded home caregivers. In other words, read literally, the amended provision provides eligible expanded home caregivers an exemption from requirements to which they are not actually subject—requirements that happen to be more demanding than those to which they are subject. Because such an interpretation of the amended provision would render the provision meaningless, and because neither party advocates for such an interpretation, the Court reads the provision to mean that eligible individuals "may submit an application to OSSE for a waiver of the qualification requirements in Subsection [170.2]," which is the subsection applicable to home caregivers. *See, e.g.*, *Chickasaw Nation v. United States*, 534 U.S. 84, 90–91 (2001) (using "common sense" to conclude that mistaken "cross-reference [wa]s simply a drafting mistake" that did "not warrant rewriting the remainder of the statute's language"); *Owner-Operator Indep. Drivers Ass'n v. United Van Lines, LLC*, 556 F.3d 690, 694 (9th Cir. 2009) ("[A] narrow exception to the principle of rigid adherence to the plain meaning of a statute is the rare case of a 'scrivener's error' that produces an 'absurd result.'"); *United States v. Coatoam*, 245 F.3d 553, 557–58 (6th Cir. 2001) (effectively correcting mistaken cross-reference because reading the statute literally would "produce[] an absurd result").

court is unable to provide an effective remedy, *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014).

Here, Sanchez and Sorcher did not file prematurely, nor have they received their requested relief. But for a case to become moot, the plaintiff need not necessarily obtain full relief. A case is also moot if "new legislation has clearly altered the posture of the case," such that "there is no longer a live 'case or controversy' before th[e] court." *American Bar Ass'n v. FTC*, 636 F.3d 641, 644 (D.C. Cir. 2011). And though ripeness typically involves early *filings*, the doctrine is meant to prevent premature *adjudication*. So if intervening circumstances make it so resolution of the issues would be premature, ripeness concerns arise. Ultimately, whether a case is ripe hinges on a "two-pronged test . . . that first considers the 'fitness of the issues' for judicial decision and then looks at any hardship that would befall the parties if the court withheld consideration." *Kaufman v. Nielsen*, 896 F.3d 475, 484 (D.C. Cir. 2018) (quoting *Abbot Labs.*, 387 U.S. at 149).

With all of this in mind, the Court begins with an examination of Sanchez. That she is now eligible for an experience waiver "clearly alter[s] the posture of the case" and thus renders her claims moot. *Am Bar Ass'n*, 636 F.3d at 644. Indeed, although the June 2018 amendments do not provide Sanchez all of the relief that she seeks—they do not definitively relieve her of the obligation to comply with the education requirements—they come awfully close: if she is ultimately granted a waiver, she will no longer be suffering any injury whatsoever due to the OSSE regulations. As far as the Court can tell, Sanchez is a good candidate for the waiver: she has the requisite ten years of continuous experience, *see* Compl. ¶ 143. Absent specific factual allegations, then, that cast doubt on Sanchez's prospects at receiving the newly available waiver, it seems a "merely hypothetical possibilit[y]" that she would be denied the waiver and remain

subject to the education requirements. *Am. Bar Ass'n*, 636 F.3d at 647. That hypothetical possibility is not enough to preserve a live case or controversy before this Court.[2] *Cf. id.* (holding case moot when plaintiffs had challenged an agency policy statement that purported to interpret an agency rule promulgated pursuant to a statute that had been amended after the complaint was filed, on the grounds it was a "merely hypothetical possibilit[y]" that the agency would promulgate new rules pursuant to the newly amended statute).

And even if the new availability of an experience waiver did not moot Sanchez's claims, it would render those claims unripe. In evaluating the first prong of the ripeness test—whether the issues presented are fit for judicial decision—the Court must consider whether "postponing review would allow the issue[s] to take on a more definite form." *Kaufman*, 896 F.3d at 483. Postponement here would do just that. Indeed, the merits of Sanchez's claims often depend heavily on *whom* the education requirements cover. For example, part of the basis of her equal protection claim is that the OSSE regulations "draw an arbitrary and irrational distinction between day-care center providers and expanded home day-care providers." Compl. ¶ 250. The Court would be far better positioned to assess the reasonableness of any such distinction if the

---

[2] Sanchez argues that if her claims are moot, an exception to the mootness doctrine applies—that exception being for cases that involve a defendant's "voluntary cessation" of the challenged action. *See* Pls.' Opp'n to Mot. to Dismiss at 6–7, ECF No. 11 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). But the voluntary cessation exception does not apply when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). Such is the case where, as here, the government's cessation of the challenged activity is formally codified into law. *See Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("Without evidence to the contrary, we assume that formally announced changes to official government policy are not mere litigation posturing."); *cf. Larsen*, 525 F.3d at 4–5 (holding case moot where plaintiffs never alleged that government would reinstitute the now-abandoned policy that plaintiffs challenged).

Court were presented with facts regarding how OSSE granted experience waivers. But the Court has no such facts at this time.

Similar uncertainty arises due to the other relevant aspect of the June 2018 amendments: the amendments' extension of both Sanchez's and Sorcher's deadlines to December 2023. Sorcher's claims are therefore unripe too. Critically, the newly extended deadline gives both Plaintiffs far more time to seek a hardship waiver. Compared to experience waivers, the text of the OSSE regulations provide less clarity about when hardship waivers will be granted, but Sanchez and Sorcher are both eligible to apply. And as was the case with Sanchez's potential experience waiver, the availability of hardship waivers may have a bearing on the merits of some of Plaintiffs' claims. Another basis for Plaintiffs' equal protection claim, for instance, is that the OSSE regulations effectively "require[] *more* early-childhood courses for day-care providers *who already have college degrees* than for those who do not." Compl. ¶ 251. This result may prove anomalous, however—and thus insignificant for purposes of an equal protection challenge—if individuals like Sorcher who have multiple advanced degrees were freely granted hardship waivers. *See, e.g.*, *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) ("[I]t is inherent in the nature of regulation that some people and businesses will be treated differently from others," and when the classifications at issue are "not inherently suspect," they "need be supported by only a rational basis."). Likewise, the availability of hardship waivers may very well have implications for Plaintiffs' substantive due process claim, the merits of which will hinge on whether there is a "reasonable fit" between OSSE's purpose in promulgating the regulations and "the means chosen to advance that purpose." *Karn v. U.S. Dep't of State*, 925 F. Supp. 1, 13 (D.D.C. 1996). Here, whether the fit is reasonable will in turn

17

depend on who actually, in practice, has to meet the education requirements, and that is difficult to know absent more information about hardship waivers.

To be sure, certain aspects of Plaintiffs' complaint are unlikely to benefit from further factual development. For example, the claim that the regulations exceeded the authority lawfully delegated to OSSE has nothing to do with the availability of hardship or experience waivers. But recall that the purpose of the ripeness doctrine is to "ensure[] that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst.*, 683 F.3d at 387. That purpose would not be served by proceeding here in a piecemeal fashion—considering certain issues now while postponing review of others. And it certainly would not be served by adjudicating the claims of individuals whose injuries are now speculative in light of regulatory changes. The Court thus thinks it appropriate to reserve judgment on all of Plaintiffs' claims until it has more facts. Because deferring review will allow many of the issues raised "to take on a more definite form," *Kaufman*, 896 F.3d at 483, the Court concludes that the first prong of the ripeness test is not satisfied for either Sanchez or Sorcher: the issues are not yet fit for judicial decision.

As for the second prong—the hardship inflicted on the parties by deferred resolution— little further discussion is necessary. As the above analysis should already make evident, both Sanchez and Sorcher have other avenues of relief potentially available to them outside of the judicial process. Sanchez can seek both a hardship waiver and an experience waiver, and Sorcher can seek a hardship waiver. According to the present (in many ways outdated) complaint, waiver applications will become available in 2019 and 2020—well before the new December 2023 deadline. *See* Compl. ¶ 61. To the extent that the new deadline still forces Sanchez or Sorcher to enroll in courses before the waiver applications become available, there is

a straightforward way to minimize the resulting hardship: dismissal of the complaint without prejudice so that Plaintiffs have the option of seeking leave to file an amended complaint. Indeed, as the Court said earlier, dismissal without prejudice is the default rule in federal litigation. *See, e.g.*, *Rudder*, 666 F.3d at 794. The Court thinks that it is at least possible here that Sanchez and Sorcher could cure the deficiencies in the complaint by pleading new facts that address the June 2018 amendments and the results of any waiver requests (or delays in acting upon such requests).

To briefly summarize, then, based on the present iteration of the complaint, Sanchez's claims are moot because her new eligibility for an experience waiver alters the posture of her case. And if Sanchez's claims are not moot, both her claims and Sorcher's claims are, in any event, unripe, because the June 2018 amendments provide the two Plaintiffs nearly five years to fulfill the education requirements, and they may each seek waivers in the meantime. Deferring adjudication until Sanchez and Sorcher have an opportunity to pursue those waivers will allow the issues raised in their complaint to take on a more definite form. Having said that, the Court's view on postponing review may change if Plaintiffs are able to allege specific facts showing that they continue to suffer actual or imminent injuries notwithstanding the benefits provided by the June 2018 amendments. The Court therefore dismisses their claims without prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED IN PART**, and the complaint is **DISMISSED WITHOUT PREJUDICE.** An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: February 26, 2019                                            RUDOLPH CONTRERAS
                                                                    United States District Judge