## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALTAGRACIA SANCHEZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION, *et al.*, <br><br> Defendants. | Civil Action No. 18-00975 (RC) |

## DEFENDANTS' MOTION TO
## DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendants the District of Columbia Office of the State Superintendent of Education (OSSE) and the District of Columbia (the District) move to dismiss plaintiff's Amended Complaint with prejudice. Fed. R. Civ. P. 12(b)(1), 12(b)(6). As set forth in the accompanying memorandum of points and authorities, dismissal is appropriate because plaintiffs have failed to state a claim for relief under the nondelegation doctrine or the Fifth Amendment to the Constitution.

The regulations plaintiffs challenge—which set minimum-education requirements for teachers at child development facilities—do not violate the nondelegation doctrine because the regulations were properly issued under a statute authorizing OSSE to set "minimum standards of operation" for child development facilities in the District of Columbia. That statutory directive is both narrow in scope and guided by the intelligible principle that the qualifications OSSE imposes must be

appropriate given the nature of child care providers' work. Plaintiffs' due process and equal protection claims under the Fifth Amendment similarly fail because the regulations are rationally related to the government's legitimate interest in promoting optimal child care outcomes. The degree requirements themselves, and the related distinctions the regulations draw, easily pass the minimal rationality standard required by the Constitution.

Alternatively, defendants move to dismiss all claims by plaintiff Jill Homan, who lacks standing, and all claims against OSSE, as duplicative of claims against the District. A proposed order is attached.

Dated:  August 13, 2020.          Respectfully submitted,

                                  KARL A. RACINE
                                  Attorney General for the District of Columbia

                                  TONI MICHELLE JACKSON
                                  Deputy Attorney General
                                  Public Interest Division

                                  */s/ Fernando Amarillas*
                                  FERNANDO AMARILLAS [974858]
                                  Chief, Equity Section

                                  */s/ Gavin N. Palmer*
                                  GAVIN N. PALMER [1619264]
                                  MATEYA B. KELLEY [888219451]
                                  Assistant Attorneys General
                                  400 Sixth Street, N.W., Suite 10100
                                  Washington, D.C. 20001
                                  (202) 805-7440
                                  gavin.palmer@dc.gov

                                  *Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALTAGRACIA SANCHEZ, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 18-00975 (RC) |
| OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**INTRODUCTION**

Plaintiffs Altagracia Sanchez, Dale Sorcher and Jill Homan raise claims against the District of Columbia Office of the State Superintendent of Education (OSSE) and the District of Columbia (collectively, the District), challenging OSSE's regulations establishing minimum-education requirements for child care providers at child development facilities. Plaintiffs' challenge is based on the theories that the statute authorizing the regulations improperly delegated legislative authority to OSSE and that the regulations violate plaintiffs' substantive due process and equal protection rights under the Fifth Amendment. The Court should grant the District's motion to dismiss because all three of plaintiffs' claims lack merit.

First, plaintiffs cannot state a nondelegation claim relying on Article I, § 8, cl. 17 of the Constitution (otherwise known as the District Clause), or any other

constitutional provision, because the constitutional nondelegation doctrine does not apply to federal territories. Because there is no constitutional rule prohibiting Congress from delegating legislative power to the District, there also is no rule requiring Congress to establish a nondelegation principle *within* the District government. Plaintiffs' nondelegation claim also fails under the Home Rule Act because the Council of the District of Columbia (the Council) properly delegated its legislative authority to OSSE to issue the regulations at issue. The provision of the D.C. Code that authorizes OSSE to establish minimum qualifications for child care workers is no different from many such minimum-qualification delegations scattered throughout the U.S. Code—all of which would fall if plaintiffs' supercharged view of the nondelegation doctrine were correct. In reality, these provisions are all valid because they contain the intelligible principle that an employee's qualifications must be appropriate given the nature of the particular job.

Second, plaintiffs' substantive due process claim fails because the minimum-education requirements are rationally related to the District's interest in promoting optimal child care outcomes. Plaintiffs do not allege that the regulations impinge upon a fundamental right, which means that the regulations are only subject to rational basis review. To overcome that deferential standard, plaintiffs must show that there was no conceivable rational basis for the District to conclude—or even rationally speculate—that degree requirements could advance that interest. Plaintiffs fail to do so.

Third, plaintiffs cannot establish that the minimum-education requirements violate their equal protection rights based on allegations that the regulatory classifications and distinctions are imperfect, rough or unscientific. Plaintiffs have failed to allege that the distinctions drawn by the regulations are discriminatory, or even that they are irrational. Therefore, plaintiffs' equal protection claim fails for much the same reason as their substantive due process claim; the regulations pass rational basis review under either constitutional theory.

Even if the Court were to allow plaintiffs' claims to proceed, plaintiff Homan should be dismissed from the case because she lacks standing, and OSSE should be dismissed as a defendant because plaintiffs' claims against OSSE are duplicative of their claims against the District of Columbia.

## BACKGROUND

I. <u>The District's Longstanding Regulation of Child Development Facilities</u>

The District has for many decades regulated child development facilities, including the minimum training and education standards for the child care providers who work in those facilities. The District issued its first set of regulations in 1974, before the Home Rule Act had taken effect. 21 D.C. Reg. 1333 (1974); *see* District of Columbia Self-Government and Governmental Reorganization Act (Home Rule Act), Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1-201.01 *et seq.*). Those regulations defined several types of child development facilities, the staffing requirements for each and the minimum qualifications for various staff

positions. *See, e.g.*, 21 D.C. Reg. at 1346 (qualifications for teachers in "child development centers").

In the late 1990s, the Council of the District of Columbia decided to create a modern, post-Home Rule Act statutory framework. It therefore enacted the Child Development Facilities Regulation Act of 1998 (Facilities Act), D.C. Law 12-215, 46 D.C. Reg. 274 (1999) (codified as amended at D.C. Code § 7-2031 *et seq.*). The Facilities Act requires all child development facilities to be licensed, establishes an enforcement scheme and authorizes the Mayor to promulgate implementing regulations. Among other things, the statute directs the Mayor to establish by regulation "[m]inimum standards … concerning staff qualification, requirements and training." D.C. Code § 7-2036(a)(1)(A).

The Mayor's rulemaking authority was initially vested in the Department of Health, which issued a new set of governing regulations in 2007. 54 D.C. Reg. 3793 (2007). Like those they superseded, these regulations established minimum qualifications for various types of child care providers, including requirements of minimum formal education or experience. *See*, *e.g.*, *id.* at 3828 (qualifications for teachers in child development centers). Shortly after the enactment of these regulations, the Mayor transferred the rulemaking authority under the Facilities Act to OSSE. Mayor's Order 2009-130, 56 D.C. Reg. 6883 (2009). OSSE is housed within the Executive Office of the Mayor and it is authorized to formulate and promulgate rules. D.C. Code § 38-2602(b)(11).

## II.   OSSE's 2016 Rulemaking

In late 2015, OSSE began rulemaking proceedings that would lead to the substantial revision of the District's child development facility regulations. "The overarching purpose," OSSE explained, was "to ensure that care provided in a licensed Child Development Facility is not only safe, but also supports children's healthy development and future academic achievement and success." 63 D.C. Reg. 11,279, 11,279 (2016). Another impetus behind the rulemaking was Congress's enactment of the Child Care and Development Block Grant Act of 2014 (CCDBG Act), Pub. L. No. 113-186, 128 Stat. 1971 (codified at 42 U.S.C. § 9858 *et seq*.), which required entities that receive certain federal funding (including the District) to undertake new regulatory obligations, *see generally* S. Rep. No. 113-118, at 5-25 (2014). Notably, the Act required the District to develop a plan describing ongoing training and professional development requirements for child care providers that would "reflect current research and best practices" in the promotion of child development and workforce quality. 128 Stat. at 1975 (codified at 42 U.S.C. § 9858c).[1]

OSSE structured its rulemaking process to allow substantial community and stakeholder input. It first drafted an advanced notice of proposed rulemaking that it posted on its website and shared with the early learning community in December

---

[1]     The Amended Complaint correctly alleges that 42 U.S.C. § 9858c(c)(2)(G)(iv) states:   "The *Secretary* shall not require an individual or entity … to acquire a credential to provide such services." Am. Compl. ¶ 20 (emphasis and alterations added). However, the Amended Complaint fails to note that the next sentence clarifies that funded entities may create and enforce credentialing requirements. *See* 42 U.S.C. § 9858c(c)(2)(G)(iv) ("Nothing in this section shall be construed to prohibit a State from requiring a credential.").

2015 to facilitate preliminary feedback. 63 D.C. Reg. at 11,280. It also scheduled four public hearings on the draft regulations in the advanced notice, and provided interpreter services at those hearings upon request. 62 D.C. Reg. 16,092, 16,092-93 (2015). After collecting feedback about the advanced notice, OSSE then published its notice of proposed rulemaking in September 2016, which triggered another 30-day window for the public to submit comments. 63 D.C. Reg. at 11,420. And OSSE then held yet another public hearing on the draft regulations that same month. 63 D.C. Reg. 14,640, 14,643 (2016).[2] OSSE published the final rulemaking on December 2, 2016. *Id.* at 14,640.

Consistent with the draft versions offered for public comment, the final regulations contained new minimum-education requirements for certain child care workers. Two requirements are relevant here. The first applies to teachers in a child development center, that is, a child care facility located in premises other than a dwelling that serves more than 12 children. 5-A DCMR § 199.1 (defining "child development center"). Teachers in these facilities will eventually need at least an associate's degree from an accredited college "with a major in early childhood education, early childhood development, child and family studies, or a closely related field" (referred to below as an "early childhood field"). 63 D.C. Reg. at 14,790 (codified at 5-A DCMR § 165.1). Alternatively, teachers who already have a college degree with a non-early-childhood major must have or obtain 24 credit hours of college coursework

---

[2]    Plaintiffs do not allege that they availed themselves of any of these opportunities to share feedback with OSSE.

in an early childhood field and also have one year of supervised occupational experience. *Id.* The second relevant requirement applies to caregivers in an expanded child development home, that is, a child care facility in a private residence where two or more caregivers oversee up to 12 children. 5-A DCMR § 199.1 (defining "expanded child development home"). These "expanded-home caregivers" will also eventually need to have at least an associate's degree in an early childhood field. 63 D.C. Reg. at 14,799 (codified at 5-A DCMR § 170.2).

The regulations also provided a process for obtaining two types of waivers. Under the "experience waiver" provisions, OSSE was permitted to waive the minimum-education requirements for directors and teachers at child development centers if the individual seeking the waiver has a minimum of ten years of continuous experience. 5-A DCMR §§ 106.5, 164.3, 164.4. The regulations also permitted facilities to seek a "hardship waiver" that exempted them from the degree requirements if they could show that the "immediate economic impact or hardship on the Facility or staff member is sufficiently great to make immediate compliance impractical despite diligent efforts," and that there would be no other adverse effects. 63 D.C. Reg. at 14,684-85 (codified at 5-A DCMR § 106.1).[3] OSSE committed to responding to all waiver requests within 30 days, *id.* at 14,685 (codified at 5-A DCMR § 106.3), and it retained authority to revoke a waiver "either upon violation of any condition attached to it, or upon the determination of OSSE that continuance of the waiver is no longer

---

[3]    In the 2016 rulemaking, OSSE unintentionally omitted an experience waiver for expanded-home caregivers; it fixed this drafting error in a later rulemaking. 65 D.C. Reg. 7032, 7033 (2018); *see* Section III below.

in the best interest of children in [the facility's] care," *id.* (codified at 5-A DCMR § 106.5).

The rulemaking required teachers and expanded-home caregivers to comply with the degree requirements by December 2, 2020 and December 2, 2019, respectively. *Id.* at 14,790-91.

## III. OSSE's 2018 Rulemaking

OSSE subsequently issued a new notice of proposed rulemaking in November 2017 based on its determination that "some staff in child development facilities will need more time to reach the minimum education requirements deadline." 64 D.C. Reg. 11,929, 11,929 (2017). OSSE proposed extending the compliance deadlines for both teachers and expanded-home caregivers to December 2, 2023. *Id.* at 11,930, 11,932. In response, OSSE received a number of comments supporting the proposed extensions, but also comments that opposed the degree requirements entirely. 65 D.C. Reg. 7032, 7032 (2018). In responding to the latter, OSSE explained that the substance of the degree requirements was beyond the scope of the rulemaking, whose "limited purpose … was to extend the timelines for compliance." *Id.* OSSE nonetheless said that it stood by the requirements, noting research that higher provider qualifications are correlated with better early childhood education and care. *Id.* at 7033. And "[t]he quality of children's earliest experiences," OSSE explained, "sets them on the path for positive language, cognitive and social-emotional development and builds essential groundwork for them to excel in school." *Id.*; *accord* S. Rep. No. 113-138, at 3 (noting "the vast evidence and research indicating that

access to high-quality early childhood education programs can have a dramatic, positive impact on the lives of young children").

In addition to soliciting public comments on the proposed regulatory changes, OSSE also submitted them to the Council for a 30-day review period, as required by a recent amendment to the Facilities Act. *See* Child Development Facilities Regulations Amendment Act of 2017, D.C. Law 22-10, 64 D.C. Reg. 5608 (codified at D.C. Code § 7-2036(a)(2)). The proposed rulemaking was deemed approved by the Council in January 2018 and became effective on June 29, 2018. 65 D.C. Reg. at 7033-34. As proposed, the final rulemaking delayed the compliance deadline for teachers and expanded-home caregivers until December 2, 2023. *Id.* at 7034-36 (codified at 5-A DCMR §§ 165.1(c), (d), 170.2(a)(2)). The final rulemaking also made experience waivers available for expanded-home caregivers, similar to teachers in child development centers. *Id.* at 7037 (codified at 5-A DCMR § 170.2(c)).

## IV.   Procedural History

Plaintiffs filed their initial complaint on April 26, 2018, before the 2018 OSSE regulations went into effect. The District moved to dismiss plaintiffs' original complaint on June 20, 2018. On February 26, 2019, this Court dismissed plaintiffs' complaint without prejudice on grounds that plaintiff Sanchez's claims were either moot or unripe, Sorcher's claims were unripe and Homan lacked standing. *Sanchez v. Office of the State Superintendent of Educ.*, Civil Action No. 18-00975, 2019 WL 935330, at *6, *9 (D.D.C. Feb. 26, 2020). The Court concluded that unlike plaintiffs Sanchez and Sorcher, Homan lacked standing to pursue her claims because her

purported injuries were "nothing more than generalized 'worrie[s]'" based on speculation about how child care workers who were not parties to the case might respond to the regulations. *Id.* at *6. The Court also found that Ms. Sanchez's claims were moot because she was eligible for an experience waiver based on the June 2018 amendments to the regulations, *id.* at *7, and that both plaintiff Sanchez's and Sorcher's claims were unripe because the compliance deadline would not go into effect until 2023, *id.* at *8-*9. The Court did not address the merits. *Id.* at *1.

On March 26, 2019, plaintiffs sought leave to amend their complaint by adding additional factual allegations or in the alternative to alter or amend the judgment, [15]. The Court denied plaintiffs' motion on the ground that the amendment would be futile because there was still no justiciable controversy. *Sanchez v. Office of the State Superintendent of Educ.*, Civil Action No. 18-00975, 2019 WL 2931285, at *1, *6 (D.D.C. July 8, 2019). Plaintiffs subsequently appealed.

On May 29, 2020, the D.C. Circuit reversed the district court's order on the ground that plaintiff Sanchez's claim was not moot and that both Sanchez's and Sorcher's claims were ripe. *Sanchez v. Office of the State Superintendent of Educ.*, 959 F.3d 1121, 1125-26 (D.C. Cir. 2020). The Court did not address whether plaintiff Homan's claims were justiciable and it did not consider the merits. *Id.* at 1126. On remand, this Court granted plaintiffs' consent motion to amend the complaint.

The operative Amended Complaint was filed on July 30, 2020. The Amended Complaint reflects changes in plaintiffs' circumstances and between the 2016 and 2018 OSSE rulemakings. Plaintiff Sanchez, who is an expanded-home caregiver

10

under OSSE's regulations, alleges that she cannot comply with the degree requirements because of lack of time and the financial cost, and because she cannot read or write in English at a college level. Am. Compl. [31] ¶¶ 165, 175-83. Plaintiff Sanchez has received an experience waiver. *Id.* ¶ 190. Plaintiff Sorcher is a social worker with master's degrees in social work and education and expressive therapy, as well as a bachelor's degree in dance. *Id.* ¶ 192. In addition to working as a social worker, Ms. Sorcher is a teacher at a Jewish preschool that qualifies as a child development center under OSSE's regulations. *Id.* ¶ 193. Ms. Sorcher alleges that she would not have time to go back to college because of her two jobs and other professional obligations. *Id.* ¶ 229. Plaintiff Homan is a parent who has two children who attend child development centers in the District on weekdays. *Id.* ¶¶ 233-36. Ms. Homan alleges that she is "worried" that the teachers she trusts may lose their jobs because of the degree requirement, that the teachers might provide worse care because of the stress of trying to comply with the requirements, and that child care might become more expensive. *Id.* ¶¶ 250-51.

Plaintiffs raise three challenges to OSSE's regulations. First, they claim that the rulemaking provision of the Facilities Act is an impermissible delegation of legislative authority under both the District Clause of the Constitution, U.S. Const. Art. I, § 8, cl. 17, and the Home Rule Act. *Id.* ¶ 275. Second, plaintiffs claim that the regulations violate their substantive due process rights under the Fifth Amendment on the ground that "[t]here is no rational basis for prohibiting someone from working in a day care because she does not have a college degree." *Id.* ¶ 279. Third, they claim

11

that the regulations violate their equal protection rights under the Fifth Amendment on the ground that the regulations draw irrational distinctions between types of child care providers. *Id.* ¶¶ 283-86.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). The Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice," including administrative proceedings that are a matter of public record. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013).

Dismissal is also appropriate any time a court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Mykonos v. United States*, 59 F. Supp. 3d 100, 103

(D.D.C.2014). This is so, for example, when the plaintiff lacks standing, *see Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016).

## ARGUMENT

## I. <u>Plaintiffs Have Failed To State a Claim Under the Nondelegation Doctrine.</u>

### A. <u>Plaintiffs Have No Viable Nondelegation Claim Under the District Clause.</u>

Plaintiffs allege that the rulemaking provision of the Facilities Act is an impermissible delegation of legislative authority under the District Clause of the Constitution. Am. Compl. ¶ 275. But plaintiffs' nondelegation claim under the District Clause fails at the outset because the District Clause is not subject to a nondelegation principle. The Supreme Court has held that Congress's plenary authority over the District allows it to delegate legislative authority to whatever government it chooses to establish, just as it can with other federal territories. *District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100, 104-10 (1952); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321-23 (1937) (affirming Congress's ability to delegate legislative power to territorial governments). Further, nothing in the Constitution requires Congress to establish a nondelegation principle *within* territorial governments. It has been the Supreme Court's "consistent view" that the Constitution's ordinary "limits on the kinds of institutions that Congress can vest with legislative, executive, and judicial power … do not apply when Congress creates institutions to govern the Territories and the District." *Ortiz v. United States*, 138 S. Ct. 2165, 2196 (2018) (Alito, J., dissenting) (collecting authorities).

As Justice Scalia explained, "Congress may endow territorial governments with a plural executive; *it may allow the executive to legislate*; it may dispense with the legislature or judiciary altogether." *Freytag v. Comm'r*, 501 U.S. 868, 914 (1991) (concurring in part and concurring in the judgment) (emphasis added). Thus, even a totally unconstrained delegation by the D.C. Council to a District agency would not violate the District Clause or any other *constitutional* constraint. In short, to the extent plaintiffs base their nondelegation claim on the District Clause, plaintiffs' nondelegation claim fails.

    **B.**    <u>Plaintiffs Have No Viable Nondelegation Claim Under the Home Rule Act.</u>

Plaintiffs also allege that the rulemaking provision of the Facilities Act is an impermissible delegation of legislative authority under the Home Rule Act. Am. Compl. ¶ 275. Although separation-of-powers principles applicable to the national government (including the nondelegation doctrine) are not constitutionally mandated, the principles generally apply to the District through the Home Rule Act. *See Wilson v. Kelly*, 615 A.2d 229, 231-32 and n.8 (D.C. 1992). In the Home Rule Act, Congress *chose* to establish a tripartite governing structure, vesting the District's legislative power in the Council, its executive power in the Mayor and its judicial power in the D.C. Court of Appeals and Superior Court. D.C. Code §§ 1-204.04(a), 1-204.22, 1-204.31(a). The D.C. Court of Appeals has found it "reasonable to infer from this tripartite structure and the vesting of the respective 'power' in each branch that the same general principles should govern the exercise of such power in the District

Charter as are applicable to the three branches of government at the federal level." *Wilson*, 615 A.2d at 231.

Therefore, it is at least conceivable that a plaintiff could succeed in a nondelegation doctrine claim under the Home Rule Act. However, as explained below, plaintiffs' nondelegation claim under the Home Rule Act cannot succeed here.

### 1. The Council's Delegation to OSSE Contains an Intelligible Principle.

The Supreme Court's nondelegation doctrine jurisprudence "has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). Consistent with that practical necessity, the nondelegation doctrine merely requires that when the legislature "confers decisionmaking authority upon agencies," it "must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001). The principle may be found in the text of the statute, and in a provision's context and structure. *See Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 33 (D.C. Cir. 2008) (holding that the Indian Reorganization Act contained an intelligible principle based on "the text, structure, and purpose" of the statute "as well as the context of its enactment"); *see also TOMAC v. Norton*, 193 F. Supp. 2d 182, 191 (D.D.C. 2002) (stating that an intelligible principle "can be discerned from statutory text, legislative history, and historic context").

15

Moreover, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman,* 531 U.S. at 475. A delegation of authority over a narrow domain may require little or even no guidance. *See id.* at 475 (noting that "Congress need not provide *any* direction" regarding delegated authority to define the term "country [grain] elevators" (emphasis added)); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 883 F.3d 895, 902-03 (D.C. Cir. 2018) (upholding delegation regarding "narrow context" of international bridge agreements with Canada and Mexico).

Indeed, "the [Supreme] Court has made clear" that the standards for any permissible delegation "are not demanding." *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.). It has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75 (internal quotation marks omitted). In its entire history, the Court has "found the requisite 'intelligible principle' lacking in only two statutes":  one that "provided literally no guidance for the exercise of discretion," and another that "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Id.* at 474; *see Panama Refining Co. v. Ryan*, 293 U.S. 388, 415 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539 (1935). In contrast, the Court has "over and over upheld even very broad delegations." *Gundy*, 139 S. Ct. at 2129 (plurality op.). It has "approved delegations to various agencies to regulate in the 'public interest'"; "sustained authorizations for

16

agencies to set 'fair and equitable' prices and 'just and reasonable' rates"; and "affirmed a delegation to an agency to issue whatever air quality standards are 'requisite to protect the public health.'" *Id.* (citations omitted); *see Nat'l Mar. Safety Ass'n v. Occupational Safety & Health Admin.*, 649 F.3d 743, 755-56 (D.C. Cir. 2011) (cataloging broad delegations that have been upheld).

Measured by the appropriately undemanding standard, the delegation at issue here easily passes muster. The statute authorizes the Mayor (acting through OSSE) to establish "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements, and training." D.C. Code § 7-2036(a)(1)(A). The Act instructs OSSE as to the limits of its authority (that OSSE may set "minimum standards of operation") as well as the targets (child development facilities) and content (staff qualification, requirements and training) of any regulations. It further defines in great detail the facilities to which it applies, D.C. Code § 7-2301, and sets forth criteria for exemption from these minimum requirements, *id.* § 7-2033, both of which further bound and guide OSSE's authority.

Indeed, statutory delegations like this—authorizing an agency to promulgate minimum qualifications for a specific category of jobs, without providing more detailed guidance—are commonplace, and do not appear to have ever been called into doubt on nondelegation grounds. The District has regulated the minimum credentialing requirements for child care providers for almost 50 years without issue, and with even less legislative guidance. *See* Background Section I.

17

Various examples from parts of the U.S. Code are also instructive. For example, the Transportation Security Administration "shall prescribe standards for the employment" of "air carrier personnel and, as appropriate, airport security personnel," to include "minimum training requirements for new employees," "minimum language skills," and "minimum education levels for employees, when appropriate." 49 U.S.C. § 449359(a). The Department of Homeland Security is directed to "prescribe standards" for auditors and inspectors in its Chemical Facility Anti-Terrorism Standards Program, including "minimum training requirements for new auditors and inspectors" and "minimum education and experience levels." 6 U.S.C. § 622(d)(1)(E). The Internal Revenue Code authorizes the Treasury Secretary to establish "minimum education and experience requirements" and "such other requirements" as he may prescribe to determine who is a "qualified appraiser" for certain tax purposes. 26 U.S.C. § 170(f)(11)(E)(ii). Similarly, the Indian Trust Reform Act instructs the Secretary of the Interior to "establish and publish in the Federal Register minimum qualifications for individuals to prepare appraisals and valuations of Indian trust property." 25 U.S.C. § 5635(b). And under the Medicare Act, a "physician assistant" or "nurse practitioner" must be licensed as such under state law and also "meet[ ] such training, education, and experience requirements (or any combination thereof) as the Secretary [of Health and Human Services] may prescribe in regulations." 42 U.S.C. § 1395x(aa)(5)(A). If plaintiffs' view of the nondelegation doctrine were to prevail, OSSE's regulations and all of these statutes—and the many others like them—would be impermissible.

18

But they are not impermissible. All of these statutes contain an intelligible principle, implicit in the statutory context, that guides agency discretion: to establish minimum qualifications that are appropriate *given the nature of the job to which they apply*. It is thus clear, for example, that if the Treasury Secretary required qualified appraisers to obtain a Ph.D. in Russian Literature, he would have deviated from "the controlling general policy" that Congress embedded in the statute. *Gundy*, 139 S. Ct. at 2136 (plurality op.). So, too, would OSSE if it required child care providers to pass the Uniform Certified Public Accountant Examination. The regulations at issue, however, indisputably require minimum credentials—higher education in early childhood development—that are appropriate given the nature of the job, which is to provide services intended to foster and further early childhood development. The Council has set out an intelligible principle, and OSSE has followed it.

### 2.  The Council's Delegation to OSSE Is Not Subject to a Higher Standard of Scrutiny.

Perhaps recognizing that their nondelegation claim is doomed under the Supreme Court's and the D.C. Circuit's precedents, plaintiffs' Amended Complaint ostensibly argues that stricter scrutiny is required because OSSE's rulemaking was not subject to any meaningful judicial review by the D.C. Court of Appeals. Am. Compl. ¶¶ 270-74. That is so, plaintiffs say, because the D.C. Administrative Procedure Act (DCAPA) provides for judicial review of adjudications only, not rulemakings. *Id.* ¶ 95 (citing D.C. Code § 2-510)). But this argument is doubly flawed.

To begin, plaintiffs do not cite any authority for the premise that the lawfulness of a delegation turns on whether (or to what extent) the delegee's actions

are subject to judicial review. The D.C. Circuit has in fact said the opposite. In *Michigan Gambling Opposition*, the court explained that, "for purposes of the non-delegation doctrine," it was not relevant that the agency's exercise of delegated authority "might be unreviewable in a court of law." 525 F.3d at 33 n.8.

In any event, plaintiffs are simply wrong that APA-style judicial review is unavailable in the local courts. It is true that the DCAPA's judicial review provision only provides for review of adjudications ("contested cases") in the D.C. Court of Appeals. D.C. Code § 2-510(a). But as that court has said many times, this does not mean that other forms of final agency action are unreviewable. "The availability of review by this court of agency decisions in 'contested cases'—those in which trial-type proceedings are required at the agency level—does not preclude judicial review in other matters, because '[a]ny party aggrieved by an agency's decision may initiate an appropriate equitable action in the Superior Court to seek redress.'" *District of Columbia v. Sierra Club*, 670 A.2d 354, 359 (D.C. 1996) (quoting *Capitol Hill Restoration Soc'y v. Moore*, 410 A.2d 184, 188 (D.C. 1979)); *see also Speyer v. Barry*, 588 A.2d 1147, 1159 (D.C. 1991) ("This court has held that [D.C. Code] § 11-921(a)(6) permits a party 'aggrieved' by a decision of a District of Columbia agency to initiate an appropriate action in the Superior Court for equitable relief[.]"); *Dupont Circle Citizens Ass'n v. Barry*, 455 A.2d 417, 424 (D.C. 1983) (noting that a party challenging an agency action "may initiate an appropriate equitable action in the Superior Court to seek redress"). Parties can and do challenge District agencies' regulations as arbitrary and capricious or otherwise contrary to law in the Superior Court, with

appellate review in the D.C. Court of Appeals. *See, e.g.*, *Capital Auto Sales, Inc. v. District of Columbia*, 1 A.3d 377 (D.C. 2010); *D.C. Hosp. Ass'n v. Barry*, 586 A.2d 686 (D.C. 1991).

Unlike the DCAPA, the federal APA does expressly state that a court can review an agency action to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). But that language was just a restatement of existing law. Notably, when Congress initially passed the federal APA, the committee report from the Senate Judiciary Committee repeatedly stated that the provisions of the Act pertaining to judicial review of agency actions were simply restating "existing law." S. Rep. No. 79-752, at 229-30 (1945). By passing the APA, Congress did not, for the first time, create the equitable power of courts to review agency regulations to determine whether they are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; that power already existed at common law.[4]

Plaintiffs also suggest that stricter nondelegation scrutiny is proper because OSSE's initial 2016 rulemaking was not subject to a legislative veto, either by the

---

[4]    *See, e.g.*, *Sierra Club*, 670 A.2d at 358 ("The authority of courts to grant relief from unlawful agency action existed at common law, and it was merely reinforced (and not created) by the federal Administrative Procedure Act"); *Columbia Realty Venture v. D.C. Hous. Rent Comm'n*, 350 A.2d 120, 123 (D.C. 1975) ("As long ago as 1902, the Supreme Court recognized that trial courts have the power to grant equitable relief to persons aggrieved by the action of an administrative agency when such action is without the authorization of law or is in contravention of law."); *Attorney General's Manual on the Administrative Procedure Act* 108 (1947) ("Courts having Jurisdiction have always exercised the power in appropriate cases to set aside agency action which they found to be '(1) arbitrary, capricious, an abuse of discretion. or otherwise not in accordance with law; … '").

Council or Congress. Am. Compl. ¶ 274. But again, plaintiffs cite no authority for the notion that the absence of a legislative veto is relevant in any way. Federal regulations are not subject to a legislative veto either. *See INS v. Chadha*, 462 U.S. 919 (1983). And only since 1996 have they been subject to the Congressional Review Act, 5 U.S.C. § 801 *et seq.*, which does not create a legislative veto, and which no court has suggested has any bearing on the stringency of the nondelegation doctrine.

As for legislative oversight more generally, the Council has always been free to revoke or revise OSSE's minimum-education regulations through its normal legislative powers (which include the ability to override a mayoral veto). D.C. Code § 1-204.04. And so too can Congress. *Id.* § 1-206.01. Thus, to the extent *either* the local *or* the national legislature can revise OSSE's regulations, they are subject to *more* legislative oversight than federal regulations, not less. And there is no reason to apply a higher standard of scrutiny to plaintiffs' nondelegation claim.

## II.   Plaintiffs Fail To State a Substantive Due Process Claim.

Plaintiffs next attack the degree requirements as a violation of their substantive due process rights. Am. Compl. ¶¶ 276-80. As plaintiffs appear to concede, *id.* ¶ 279, because no fundamental rights are implicated, the rational basis standard applies. *See, e.g.*, *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (applying rational basis review and rejecting due process challenge to licensing requirements for teeth-whiteners); *Locke v. Shore*, 634 F.3d 1185, 1195-96 (11th Cir. 2011) (same for interior designers); *Nat'l Ass'n for Advancement of*

*Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1050-53 (9th Cir. 2000) (same for psychoanalysts).

For OSSE's regulations to survive rational basis review, they must be rationally related to some legitimate state interest. *Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011). At the motion to dismiss stage, that deferential standard requires a plaintiff to plead facts showing that the challenged law could not even *conceivably* be rational. *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (per curiam). Plaintiffs have not, and cannot, meet that requirement here because it is conceivably rational that requiring child care providers to obtain degrees in an early childhood field would benefit the District's children.

Importantly, "a legislative choice is not subject to courtroom fact-finding *and may be based on rational speculation unsupported by evidence or empirical data.*" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (emphasis added). Similarly, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993). Even a law that in many instances "may exact a needless, wasteful requirement" can satisfy rational basis review. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955). Given how "highly deferential" the standard is, *Dixon*, 666 F.3d at 1342, "it should come as no surprise that the [Supreme] Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny," *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018). "On the few occasions where [it has] done so, a common thread has been that the laws at issue lack any

purpose other than a bare desire to harm a politically unpopular group." *Id.* (alterations and internal quotation marks omitted).

OSSE's minimum-education regulations easily pass the rational basis test. Plaintiffs do not (and could not) contend that the regulations were motivated by a bare desire to harm a politically unpopular group. Instead, they argue that there is no conclusive evidence that college degrees improve educational outcomes. Am. Compl. ¶ 143. But plaintiffs' disagreement with the requirement does not establish that the requirement lacks a rational basis. *See Beach Commc'ns*, 508 U.S. at 315 (rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices"). The regulations at issue here start with "a strong presumption of validity," and those attacking its rationality "have the burden to negate every conceivable basis which might support it." *Beach Commc'ns*, 508 U.S. at 315 (internal quotation marks omitted). All that is required is that the District assert a plausible reason, *Robinson v. Huerta*, 123 F. Supp. 3d 30, 43 (D.D.C. 2015), which it has.

The rational relationship here is no more than that involved in requiring a science teacher to have a science degree, an accountant to have an accounting degree, or a lawyer to have a law degree. It is possible that some people without these degrees could perform these jobs perfectly well, and lawmakers are not compelled to impose such requirements. But it would surely be reasonable to do so—and to do so solely "based on rational speculation." *Beach Commc'ns*, 508 U.S. at 315. Similarly, OSSE's regulations manifestly are rationally related to the District's legitimate interest in promoting the optimal growth of young children. They require professional child-care

providers to obtain an associate's degree with a major in an early childhood field, ensuring that they have substantial knowledge about early childhood education, child development, and related topics—knowledge likely to improve their caregiving and teaching practices.

Plaintiffs' efforts to show that the degree requirements fail the rational basis test fall short. First, plaintiffs note that associate's degrees are generalist degrees that require some amount of coursework not strictly focused on early childhood education and development. Am. Compl. ¶ 146. But this is, at worst, "an imperfect fit between means and ends," which does not undermine rationality. *Heller*, 509 U.S. at 321. And on plaintiffs' logic, essentially any specific-major requirement is irrational, given that almost all college degree programs entail general education requirements. That is incorrect. It is rational for a public high school to require its algebra teachers to have a bachelor's degree in mathematics, even if most bachelor's degree programs require math majors to take foreign language, history or humanities coursework.

Next, plaintiffs contend that the burden of complying with the degree requirement will be insurmountable for some child care workers because of the financial cost, the time required or language barriers. *See, e.g.*, Am. Compl. ¶¶ 175-83, 229. This does not make the regulations constitutionally irrational. It is true that some child care workers may not be able to comply with the requirements, but that is true of any degree requirement. OSSE could reasonably conclude that, in its judgment, the long-term benefits to the District's children from better-educated child care providers outweigh the costs to particular providers who find it onerous (or

impossible) to comply. That is especially true given three features of the regulatory scheme that mitigate the burden on providers: (1) the degree requirements do not take effect until December 2023; (2) an experience waiver is available for those providers, such as Ms. Sanchez, who had ten continuous years of experience when the regulations were issued; and (3) a hardship waiver is available for other providers for whom immediate compliance with the degree requirement is impractical despite diligent efforts. Under the rational basis test, it is "not … for courts to judge the wisdom, fairness, or logic" of OSSE's decision to strike the balance as it did. *Beach Commc'ns*, 508 U.S. at 313.

Finally, plaintiffs try to enlist the aid of a 2015 report by the National Academies of Sciences entitled *Transforming the Workforce for Children Birth Through Age 8: A Unifying Foundation* (the Report), *available at* https://www.fcd-us.org/assets/2016/10/IOMNRCFullReport2015.pdf, which plaintiffs allege inspired OSSE's minimum-education regulations. Am. Compl. ¶¶ 139-45. But plaintiffs' contention that the Report somehow calls into doubt the constitutionality of OSSE's regulations lacks merit. To begin, insofar as plaintiffs suggest that the Report fails to affirmatively support OSSE's degree requirements, that would be irrelevant even if true. For purposes of substantive due process, OSSE did not need to have a study or any other "evidence or empirical data" to justify its decision; "rational speculation" was enough. *Beach Commc'ns*, 508 U.S. at 315.

Still, it is worth noting that a meta-analysis published in January 2017 found "a significant and positive correlation between teacher qualification and quality with

respect to the learning environment for all young children in [early childhood education and care] settings, including infants and toddlers." *See* Matthew Manning, *et al.*, *The Relationship Between Teacher Qualification and the Quality of the Early Childhood Education and Care Environment*, Campbell Systematic Reviews, Jan. 2017, at 1, 62, https://doi.org/10.4073/csr.2017.1. Although OSSE did not rely on this January 2017 meta-analysis when it promulgated the degree requirements in December 2016, the rational basis test is *objective*, not *subjective*, and the study further supports the objective rationality of OSSE's decision.

To the extent plaintiffs suggest that the Report does not merely fail to support but in fact *refutes* the rationality of OSSE's regulations, they misconstrue the Report. To be sure, as plaintiffs note, Am. Compl. ¶ 143, the Report states that "existing research on the relationship between the education level of educators and the quality of instruction or children's learning and development is inconclusive." Report at 434. But the authoring committee, "draw[ing] on its collective expert judgment," nonetheless recommended that States begin to transition toward a bachelor's degree requirement for all lead educators working with children from birth through age 8. *Id.* at 514. The Report provides a host of reasons in favor of this bachelor's degree recommendation, including that: (1) current research does not rule out "the potential that a high-quality college education can better equip educators with the sophisticated knowledge and competencies needed to deliver high-quality educational practices that are associated with better child outcomes at all ages"; (2) "[h]olding lower educational expectations for early childhood educators than for elementary

school educators perpetuates the perception that educating children before kindergarten requires less expertise than educating K-3 students, which helps to justify policies that make it difficult to maximize the potential of young children and the early learning programs that serve them"; and (3) "[d]isparate degree requirement policies create a bifurcated job market" as between elementary schools and other child care providers, one in which higher-skilled educators may be less likely to work with younger children, which "potentially perpetuates a cycle of disparity in the quality of the learning experiences of young children." *Id.*; *see generally id.* at 513-21. Further, as the Report noted, "if the work of lead educators for younger children is based on the same science of child development and early learning and the same foundational competencies, it follows that they should be expected to have the same level of education," and "[f]ew would argue ... that current expectations for early elementary school teachers should be lowered." *Id.* at 515.

Contrary to plaintiffs' characterization, the Report did not fail to "take into account the many potential costs involved in requiring day-care providers to get college degrees," Am. Compl. ¶ 144; rather, the Report forthrightly acknowledged the various "*possible* negative consequences" that plaintiffs highlight, Report 8 (emphasis added), and it made its recommendation *despite* those risks. And even if OSSE had in fact performed an improper cost-benefit analysis, that still would not mean that the regulations lacked a rational basis, *see Se. Land Dev. Assoc., L.P. v. District of Columbia*, Civil Action No. 05-01413, 2005 WL 3211458, at *7 (D.D.C. Nov. 1, 2005) ("[Even though the District] under-estimated the true cost, such conduct does not rise

to the level required to support a claim for a constitutional violation of substantive due process."); *see also Williamson*, 348 U.S. at 487 (stating that "it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement").

In the end, plaintiffs fundamentally misperceive the deferential review that has long been applied to claims of this kind. "The day is gone," the Supreme Court wrote in 1955, "when this Court uses the Due Process Clause … to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson*, 348 U.S. at 488; *see Nat'l Ass'n for the Advancement of Psychoanalysis*, 228 F.3d at 1051 ("Because the *Lochner* era has long passed, this argument [challenging licensing requirements] must fail.").

III. **Plaintiffs' Equal Protection Claim Fails Because the Complaint Does Not Allege Different Treatment of Similarly Situated Groups.**

Finally, plaintiffs raise an equal protection claim based on various classifications and exemptions in the regulations. Am. Compl. ¶¶ 283-87. But plaintiffs' equal protection claim fails because they have not plausibly alleged "that the government intentionally treated [them] differently from others who were similarly situated." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015); *see United States v. Bell*, 506 F.2d 207, 221-22 (D.C. Cir. 1974) ("That different persons receive different treatment at the hand of Government does not, without more, demonstrate constitutional inequality"). Moreover, there is a rational basis for the alleged differential treatment.

As with plaintiffs' substantive due process claim, rational basis review applies to plaintiffs' equal protection claim because the classifications at issue do not "proceed[ ] along suspect lines" or "infringe[ ] fundamental constitutional rights." *Beach Commc'ns*, 508 U.S. at 313. Under rational basis review, plaintiffs cannot establish an equal protection violation "merely because the classifications made by its law are imperfect." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000) (alterations and internal quotation marks omitted). As the Supreme Court has acknowledged, "[d]efining the class of persons subject to a regulatory requirement … inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," and whether "the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Beach Commc'ns*, 508 U.S. at 315-16 (internal quotation marks omitted). Rough, imperfect, unscientific, and underinclusive classifications are all permissible. *See Kimel*, 528 U.S. at 84; *Beach Commc'ns*, 508 U.S. at 313-16 and n.7; *Kaemmerling v. Lappin*, 553 F.3d 669, 685 (D.C. Cir. 2008). And it is rational for lawmakers to "select one phase of one field and apply a remedy there, neglecting the others," because "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think." *Williamson*, 348 U.S. at 489.

As discussed below, plaintiffs point to three distinctions created by OSSE's regulations that they argue are of constitutional magnitude, but all of these

distinctions survive rational basis scrutiny because plaintiffs are not similarly situated to any of the other child care providers who are exempt from the regulations.

### A.   The Regulations Do Not Draw an Irrational Distinction Between Day-Care Teachers and Other Child Care Workers.

First, plaintiffs argue that the regulations draw an irrational distinction between day-care providers (who are required to satisfy the minimum-education requirements) and other child care workers such as nannies (who are not). Am. Compl. ¶ 283. To be sure, OSSE's degree requirements do not apply to *all* child care providers; the regulations contain exemptions for various type of child care providers such as babysitters, nannies, parent-supervised play groups and day-care facilities operated by the federal government. *See* 5-A DCMR § 101.5 (listing services that are exempt from licensing requirements). But these exempt entities all obviously differ from child development facilities in ways that make it rational to subject them to different regulatory regimes.

Babysitters and nannies, for instance, do not regularly care for three or more unrelated children outside the children's homes. *Cf.* 5-A DCMR § 101.3 (defining child development facility). Parent-supervised play groups are by definition supervised by the *parents* of the children involved. *See* D.C. Code § 7-2031(3B), (4A). And nannies are individual child care providers rather than "facilities" which means they are outside the scope of the Facilities Act. *See* 5-A DCMR §§ 101.5, 164.4. Plaintiffs are not denied equal protection of the laws based on the differential treatment from other child care providers because OSSE lacks regulatory authority over those groups,

which is why other child care providers, such as nannies, are exempt from those regulations.

Even if nannies, for example, should ideally also have more formal education, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970); *see Nat'l Ass'n for Advancement of Psychoanalysis*, 228 F.3d at 1052-53 (rejecting argument that California's "psychology licensing laws have no rational basis because [its] licensing schemes for other, similar counseling professions are less stringent"). The Equal Protection Clause "does not Compel … [l]egislatures to prohibit all like evils or none. A legislature may hit at an [issue] it has found, even though it has failed to strike at another." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 151 (1938).

B. **The Regulations Do Not Draw an Irrational Distinction Between Private, Parochial and Independent Schools with Full-Time Elementary and Secondary Education Programs with Day Cares Attached and Similar Institutions that Only Serve Children Part Time.**

Second, plaintiffs argue that it was arbitrary and irrational to subject private, parochial and independent schools with day cares attached to the minimum-education requirements when they only serve children part time but not to subject institutions to the requirements when they provide similar services full time. Am. Compl. ¶¶ 284-85. But this classification is not irrational either because, as noted above, it is completely rational for OSSE to differentiate among child care workers based on the settings in which they work.

Indeed, OSSE could reasonably think that day cares operated by and co-located with full-time elementary or secondary schools are already more likely than other institutions to have staff with relevant college degrees, and that there is thus less need to impose a degree requirement on them. Therefore, it was not irrational for OSSE to distinguish between child care providers in private schools with full-time K-programs and those in private institutions like Ms. Sorcher's synagogue, which provides only "morning, evening, and weekend programs" for K-12-aged children. Am. Compl. ¶ 197; *see* 5-A DCMR § 165.6. It was rational for OSSE to focus its regulations on those institutions where it felt the degree requirements would make the most effect, and to leave others exempt. Once again, plaintiffs merely contend that OSSE's degree requirements are underinclusive, ignoring the principle that lawmakers are free to "select one phase of one field and apply a remedy there, neglecting the others." *Williamson*, 348 U.S. at 489.

### C. The Regulations Do Not Draw an Irrational Distinction Between Teachers at Child Development Facilities Who Have College Degrees and Those Who Do Not.

Third, plaintiffs allege that the regulations draw an impermissible distinction between those with and without the requisite degrees, because in plaintiffs' view, "[t]here is no rational basis for prohibiting someone from working in a day care because she does not have a college degree." Am. Compl. ¶ 287. This is nothing more, however, than a relabeling of plaintiffs' substantive due process claim, and it fails for the reasons already discussed. *See, e.g.*, *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 923 (D.C. Cir. 2013) (rejecting equal protection and substantive due process

claims for the same reasons). Moreover, "[a]s a matter of judicial economy, courts should dismiss duplicative claims." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D.D.C. 2010).

Plaintiffs also contend that the regulation governing child development center teachers, 5-A DCMR § 165, draws an irrational distinction between teachers who already have a college degree with a major in a non-early-childhood field and those without a degree. Am. Compl. ¶ 286. That is so, they argue, because teachers with a degree in a non-early-childhood field must earn 24 credit hours in early childhood studies, but some degree programs with a qualifying major require *fewer* than 24 credit hours of early childhood studies. *Id.*; *see also id.* ¶¶ 148-55 (discussing variations in credit hours between different degree programs at different schools).

Despite this possibility, the distinction in this regulation is not irrational. In fact, the logic of the 24-credit-hours option is straightforward:  for teachers who already have degrees in other subjects, this option allows them to qualify by taking roughly a major's worth of early childhood coursework. That the specific credit requirements to obtain a major or minor in early childhood learning may differ among schools does not change the conclusion that providing options to obtain licensure is not discriminatory. OSSE had to select some number of credit hours to treat as equivalent to a major's worth. It may be true that some degree programs require fewer than 24 credit hours of core coursework, but it is also true that other programs

may require significantly *more* than 24 credit hours.[5] Given the variations among degree programs, OSSE's selection of 24 credit hours as an approximation of a major's worth of study easily passes constitutional muster. *See Beach Commc'ns*, 508 U.S. at 316 n.7 ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." (internal quotation marks omitted)); *Usery*, 428 U.S. at 29 (holding that 10- and 15-year employment benchmarks used to create a presumption of disability in miners who had contracted pneumoconiosis was not "purely arbitrary" simply because they "fail[ed] to account for varying degrees of exposure," and that "[n]o greater mathematical precision [was] required" in selecting those benchmarks).

## IV.   Plaintiff Homan Lacks Standing.

This Court previously found that plaintiff Homan lacks standing to assert her claims, *see Sanchez*, 2019 WL 935330, at *6, and there is no reason for the Court to reach a different conclusion based on plaintiffs' Amended Complaint.

Although Ms. Homan allegedly *worries* that the quality of care at her children's day-care facility could potentially be worse because of the minimum-education requirements, Am. Compl. ¶ 250, she does not allege that it actually *will* be worse. This speculative, hypothetical injury is insufficient to confer standing. *See Sanchez*, 2019 WL 935330, at *6 (finding that Homan's "speculation" that her children's day-

---

[5]     As plaintiffs noted on appeal, The University of the District of Columbia Community College requires 36 credit hours in early-childhood classes for an associate's degree with a major in Infant/Toddler Education. The Court may take judicial notice of this fact. *See* Fed. R. Evid. 201.

care providers "will become tired and stressed and consequently provide worse care" was "insufficient for purposes of standing"); *cf. In re VTech Data Breach Litig.*, Civil Action No. 15-10889, 2017 WL 2880102, at *4 (N.D. Ill. July 5, 2017) ("To the extent that plaintiffs are worried that other hackers may have accessed their data in a different data breach, that is the sort of speculative harm that cannot meet the injury-in-fact requirement").

Ms. Homan also claims that the price of day care has increased since the regulations were implemented, and she worries that it will continue to increase. Am. Compl. ¶¶ 238-39, 251. But she does not provide any plausible facts that the minimum-educations requirements *caused* the increase; after all, the requirement has not even begun to take effect. And Ms. Homan's concern that prices could increase when the regulations do take effect is a "merely 'conjectural' and 'hypothetical'" injury that is insufficient to confer standing. *Sanchez*, 2019 WL 935330, at *6; *cf. Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (finding no redressability when injuriously high prices "might remain high" even if plaintiffs obtained injunction).

## V.   OSSE Should Be Dismissed As a Defendant.

If any of plaintiffs' claims survive the District's motion to dismiss, the Court should dismiss OSSE as a defendant because it is a subordinate agency of the District of Columbia that is *non sui juris. See* D.C. Code § 38-2601(a) ("There is established, under the Office of the Mayor, an Office of the State Superintendent of Education."). "[T]he overwhelming weight of precedent in this Circuit … holds that in the absence of explicit statutory authorization, bodies within the District of Columbia government

are not suable as separate entities." *Kundrat v. District of Columbia*, 106 F. Supp. 2d 1, 7 (D.D.C. 2000) (internal quotation marks and citations omitted).

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Amended Complaint with prejudice.

Dated:  August 13, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Gavin N. Palmer*
GAVIN N. PALMER [1619264]
MATEYA B. KELLEY [888219451]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 805-7440
gavin.palmer@dc.gov

*Counsel for Defendants*