**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALTAGRACIA SANCHEZ, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.:     18-975 (RC) |
| | : | |
| v. | : | Re Document Nos.:   32, 33 |
| | : | |
| OFFICE OF THE STATE | : | |
| SUPERINTENDENT OF EDUCATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Gʀᴀɴᴛɪɴɢ Dᴇꜰᴇɴᴅᴀɴᴛs' Mᴏᴛɪᴏɴ ᴛᴏ Dɪsᴍɪss

**I.  INTRODUCTION**

This case involves regulations promulgated by the D.C. Office of the State Superintendent of Education ("OSSE") that impose minimum education requirements on certain childcare providers that operate in the District of Columbia.  Plaintiffs, two childcare providers and one parent, argue that the regulations resulted from an unconstitutional delegation of power and that they violate the Due Process and Equal Protection Clauses of the U.S. Constitution. Defendants have moved to dismiss Plaintiffs' claims.  This Court previously considered a motion to dismiss but ruled that Plaintiffs' failed to overcome several jurisdictional hurdles.  Plaintiffs appealed and the D.C. Circuit reversed and remanded for consideration of the merits of Plaintiffs' allegations.  *See Sanchez v. Off. of the State Superintendent of Educ.*, 959 F.3d 1121 (D.C. Cir. 2020).  Defendants now argue that, accepting as true the factual allegations in the Amended Complaint, Plaintiffs have failed to state a plausible claim to relief.  For the reasons set forth below, the Court agrees and, therefore, grants Defendants' motion to dismiss.

## II.  BACKGROUND

### A.  Statutory and Regulatory Framework

The Child Development Facilities Regulation Act of 1998 ("Facilities Act"), D.C. Law 12-215, 46 D.C. Reg. 274 (1999) (codified as amended at D.C. Code § 7-2031 *et seq.*), requires certain childcare providers in the District of Columbia to obtain a license to operate, *see* D.C. Code § 7-2034(a).  The Facilities Act delegates rulemaking power to the Mayor to promulgate "all rules necessary to implement the provisions of" the Facilities Act.  *Id.* § 7-2036(a)(1).  The delegation of authority requires that the Mayor set "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training, facility size, staff-child ratios and group size, program design and equipment requirements, safety and health standards, care for children with special needs, nutrition standards, and record keeping requirements."  *Id.* § 7-2036(a)(1)(A).  The Facilities Act defines "child development facility" as "a center, home, or other structure that provides care and other services, supervision, and guidance for children, infants, and toddlers on a regular basis, regardless of its designated name."  *Id.* § 7-2031(3).  The Facilities Act specifically exempts from its requirements babysitters, informal playgroups, parent-led play cooperatives, childcare furnished in places of worship during religious services, care provided by relatives, childcare provided by the federal government, and certain pre-kindergarten education programs.  *Id.* § 7-2033.  The Mayor has delegated the rulemaking power under the Facilities Act to OSSE.  *See* Mayor's Order 2009-130, 56 D.C. Reg. 6883 (July 16, 2009).

Pursuant to this authority, OSSE issued regulations that set minimum education requirements for childcare staff at child development facilities.  *See generally* D.C. Mun. Regs. tit. 5-A1, §§ 100–99.  Under the regulations, teachers at childcare development centers, located

on premises other than a dwelling that serve more than twelve children, must obtain at least an associate's degree from an accredited college "with a major in early childhood education, early childhood development, child and family studies, or a closely related field." *Id.* § 165.1. Caregivers in an expanded child development home, which is a facility located in a private residence where two or more caregivers oversee up to twelve children, must obtain the same. *Id.* § 170.2. The requirements did not become immediately binding; when initially promulgated, the regulations generally provided a grace period of anywhere between three and six years. *See, e.g.*, 63 D.C. Reg. 14,786, 14,799 (original versions of D.C. Mun. Regs. tit. 5-A1, §§ 164.1(b), (c) and 170.2(a)(1)(2)).[1] The regulations also provided that OSSE could waive compliance with any of the education requirements if presented with clear and convincing evidence that (1) "[t]he demonstrated . . . economic impact or hardship on the Facility or staff member [was] sufficiently great to make immediate compliance impractical despite diligent efforts;" (2) "[t]he facility or staff member [was] meeting or exceeding the intent of the regulation for which the waiver [was] requested; and" (3) "[t]he health and welfare of staff and children [we]re not jeopardized." D.C. Mun. Regs. tit. 5A-1, § 106.1. OSSE provided for another exemption for certain staff positions for individuals who had, as of December 2016, "continuously served" in the relevant staff position for ten or more years. *Id.* §§ 165.4, 170.2.

The regulations make three distinctions relevant to the current case. First, the regulations, like the Facilities Act, specifically exempt certain childcare providers, such as babysitters and nannies, from the degree requirements. *Id.* § 101.5. Second, the regulations

---

[1] In June 2018, OSSE amended its regulations to allow more time to comply with the degree requirements. 65 D.C. Reg. 7034–7036 (June 29, 2018); *see also* D.C. Mun. Regs. tit. 5-A1 §§ 165.1(d), 170.2(a)(2). The deadline for compliance relevant to this case is now December 2023. *See* D.C. Mun. Regs. tit. 5-A1 §§ 165.1(d), 170.2(a)(2).

specifically exempt private schools that provide "education services to children in grades pre-K-through twelfth (12th) grade during [] a full school day." *Id.* § 101.5(l).  Under this exemption, private, parochial, or independent schools that have full-time elementary or secondary educational programs in addition to infant and toddler care on the same premises need not comply with the minimum degree requirements.  *See id.* § 165.6.  Third, teachers at childhood development centers who already possess a college degree in a major other than an early childhood field must obtain at least twenty-four credit hours of college coursework in an early childhood field.  *Id.* § 165.1.

## B.  Factual and Procedural Background

Plaintiff Altagarcia Sanchez is subject to the new education requirements as an "expanded home caregiver."  *See generally id.* §§ 169–71.  She runs a licensed daycare out of her house and currently cares for nine children.  *See* Am. Compl. ¶ 164, ECF No. 31.  Although she carries a doctoral degree in law from her home country, *id.* ¶ 157, she never attended college in the United States, *id.* ¶ 159.  Plaintiffs allege that, given the demands of her work schedule, it would take Ms. Sanchez at least five years to complete the degree requirements as a part-time student, which they estimate would require around sixty credit hours.  *See id.* ¶¶ 170–75.  However, Plaintiffs allege that Ms. Sanchez cannot afford to attend college, even part-time.  *Id.* ¶¶ 180–83.  Ms. Sanchez received a waiver to the degree requirement in April 2019, but she fears that OSSE may revoke the waiver at some point in the future.  *Id.* ¶¶ 190–91.

Plaintiff Dale Sorcher is what the regulations refer to as a teacher at a child development center.  *See* D.C. Mun. Regs. tit. 5A-1, § 165.  Ms. Sorcher teaches children ages zero to three at a Jewish preschool attached to the synagogue she attends.  Am. Compl. ¶¶ 193–95.  Although Ms. Sorcher has two master's degrees and a bachelor's degree, she does not have the requisite

education in early childhood education called for by the regulations. *Id.* ¶¶ 192, 211–12. The synagogue does have educational programs for elementary and secondary students but does not offer full-time educational programs. *Id.* ¶ 197. Plaintiffs allege that Ms. Sorcher is not eligible for a waiver of the degree requirement, *id.* ¶ 226, and that she does not have time to go back to college, *id.* ¶ 229. Furthermore, Plaintiffs maintain that Ms. Sorcher does not need more education in order to competently do her job. *Id.* ¶ 230.

Plaintiff Jill Homan is a parent whose young daughter attends a licensed daycare center subject to the regulations. *Id.* ¶¶ 234, 245–50. Ms. Homan is "afraid that the caregivers she trusts will not be able to comply with the college requirement and will lose their jobs." *Id.* ¶ 247. She worries that daycare providers forced to attend college in addition to their work duties will be "exhausted, stressed, and overwhelmed" and "will provide worse care than those who do not have to worry about attending school." *Id.* ¶ 250. She also believes that "day care will continue to become more expensive under the college requirement." *Id.* ¶ 251.

Plaintiffs bring three counts against the District of Columbia and OSSE (together "Defendants") related to the OSSE regulations. First, Plaintiffs argue that the Facilities Act's delegation of authority to the Mayor to promulgate minimum educational standards violates the District of Columbia Self-Government and Governmental Reorganization Act (the "D.C. Home Rule Act"), D.C. Code §§ 1-201.01– 1.207.71, and the U.S. Constitution's nondelegation doctrine. *Id.* ¶¶ 263–75. Second, Plaintiffs claim that the OSSE regulations violate their Fifth Amendment Due Process rights because "[t]here is no rational basis for prohibiting someone from working in a day care because she does not have a college degree." *Id.* ¶ 279. Finally, Plaintiffs argue that the OSSE regulations draw arbitrary and irrational distinctions between

different types of day-care providers and facilities, which they maintain violates the Equal

Protection Clause. *Id.* ¶¶ 281–88.

      This Court previously considered a motion to dismiss Plaintiffs' Compliant. *See Sanchez v. Off. of State Superintendent of Educ.*, No. 18-cv-975, 2019 WL 935330 (D.D.C. Feb. 26, 2019). The Court dismissed all of Plaintiffs' claims on threshold, jurisdictional grounds. *See id.* at \*5–6 (dismissing Ms. Homan's claims for lack of standing); *id.* at 6–9 (dismissing other claims as moot and unripe). The Court thus declined to consider the merits of Plaintiffs' challenges under the nondelegation doctrine, the Due Process Clause, and the Equal Protection Clause. Plaintiffs appealed. Finding that the doctrines of mootness and ripeness did not bar any of Plaintiffs' claims, the D.C. Circuit determined that Plaintiffs' purely legal challenges are presumptively reviewable. *See Sanchez*, 959 F.3d at 1124–26. The court reversed and remanded for consideration of the merits of Plaintiffs' claims, finding that the claims are justiciable. *See id.* at 1123.

      After remand, Plaintiffs' filed an Amended Complaint. *See* Am. Compl. Defendants' motion to dismiss argues that, even accepting the factual allegations as true, Plaintiffs fail to state a plausible claim to relief with respect to each count in the Amended Complaint. *See* Defs.' Mot. Dismiss ("Defs.' Mot."), ECF No. 33. In addition to the motion to dismiss, Plaintiffs filed a motion for discovery notwithstanding the pending motion to dismiss. *See* Pls.' Mot. Notwithstanding Mot. Dismiss, ECF No. 32. Plaintiffs' motion argues that the Court should permit limited discovery despite the pending motion to dismiss. *See id.* at 1–3. Both motions are ripe for decision.

### III.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The complaint's factual allegations are to be taken as true, and the court is to construe them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  Notwithstanding this liberal construal, the court deciding a Rule 12 motion must parse the complaint for "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility requirement means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

### IV.  ANALYSIS

As explained above, Plaintiffs bring three claims against Defendants.  First, Plaintiffs argue that the rulemaking provision of the Facilities Act is an impermissible delegation of

legislative power in violation of the D.C. Home Rule Act and the U.S. Constitution.  Second,

Plaintiffs argue that the OSSE regulations violate Plaintiffs' substantive due process rights

guaranteed by the Fifth Amendment.  Third, Plaintiffs argue that the OSSE regulations violate

the equal protection clause by making arbitrary and irrational distinctions.  Defendants argue that

Plaintiffs have failed to allege sufficient facts to withstand a motion to dismiss with respect to

each claim.[2]  The Court addresses each claim in turn.

### A.  Nondelegation Doctrine Claim

Article I of the Constitution states that "[a]ll legislative Powers herein granted shall be

vested in a Congress of the United States."  U.S. Const. art I, § 1.  "This text permits no

delegation of those powers."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  As

such, "[i]n a nondelegation challenge, the test is whether Congress has set forth 'an intelligible

principle to which the person or body authorized to act is directed to conform.'"  *TOMAC,*

*Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting

*Whitman*, 531 U.S. at 472 (alterations and internal quotations omitted)).  To determine the

boundaries of a delegation, courts look to the statutory language, the purpose of the statute, its

factual background, and the statutory context.  *Michigan Gambling Opposition v. Kempthorne*,

525 F.3d 23, 30 (D.C. Cir. 2008) (citing *TOMAC*, 433 F.3d at 866 (quoting *Am. Power & Light*

*Co. v. SEC*, 329 U.S. 90, 104 (1946)).  "[T]he degree of agency discretion that is acceptable

varies according to the scope of the power congressionally conferred."  *Whitman*, 531 U.S. at

475.  Although broad delegations of power may require "substantial guidance," relatively narrow

delegations of power need not be accompanied by explicit direction or any direction at all.  *Id.*

---

[2] Defendants also argue that Ms. Homan lacks standing, *see* Defs.' Mot. at 35–36, and that OSSE should be dismissed as a defendant, *see id.* at 36.  Because the Court has determined that Plaintiffs have failed to state a claim, it will not address these arguments.

(noting that Congress need not provide direction to EPA to define "country elevators" but must provide "substantial guidance on setting air standards that affect the entire national economy"). Though the D.C. Court of Appeals has not held that the nondelegation doctrine applies to the District's government, both parties apparently agree that it applies by application of the Home Rule Act.  *See* Defs.' Mot. at 14–15; Pls.' Opp'n at 14, ECF No. 34 ; *see also Unum Life Ins. Co. of Am. v. District of Columbia*, 238 A.3d 222, 232 (D.C. 2020) (assuming without deciding applicability of nondelegation doctrine and applying Supreme Court precedent to resolve issue). For purposes of the present motion to dismiss, the Court assumes the applicability of the nondelegation doctrine to delegations by the District Council to District agencies.

Defendants argue that the delegation of authority in the Facilities Act contains an intelligible principle "to establish minimum qualifications that are appropriate *given the nature of the job to which [childcare providers] apply*."  Defs.' Mot. at 19.  Defendants first note that "the standards for any permissible delegation 'are not demanding,'" *id.* at 16 (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.)), and that the Supreme Court has consistently upheld even broad delegations of authority, *see id.*  Defendants argue that the Facilities Act instructs the Mayor[3] "as to the limits of [her] authority (that [she] may set 'minimum standards of operation') as well as the targets (child development facilities) and content (staff qualification, requirements and training) of any regulations."  *Id.* at 17 (quoting D.C. Code § 7-2036(a)(1)).  Defendants point to a variety of similar delegations of authority to set minimum education or training standards that contain virtually the same level of direction. *See id.* at 18 (discussing similar delegations to the Transportation Security Administration, the

---

[3] The District actually states that the Facilities Act "instructs OSSE," *id.* at 17, but the statutory delegation of authority grants rulemaking authority to the Mayor, *see* D.C. Code § 7-2036(a)(1).

Department of Homeland Security, the Treasury Secretary, and the Secretary of the Interior).

Finally, Defendants argue that Plaintiffs offer no legal support for their argument that some

stricter scrutiny should be required because the D.C. Administrative Procedure Act ("DCAPA"),

D.C. Code § 2-510, does not provide for judicial review of rulemakings.  *See id.* at 19–22 (citing

Am. Compl. ¶¶ 270–74, 95).  Defendants claim that "whether (or to what extent) the delegee's

actions are subject to judicial review" does not change the nondelegation doctrine analysis.  *Id.* at

19–20 (citing *Michigan Gambling Opposition*, 525 F.3d at 33 n.8).  In any event, Defendants

challenge Plaintiffs' underlying premise and argue that rulemakings by D.C. agencies can, in

fact, be reviewed by the D.C. Superior Court.  *See id.* at 20 (citing *District of Columbia v. Sierra

Club*, 670 A.2d 354, 359 (D.C. 1996)).

In opposition, Plaintiffs claim that the delegation of authority in the Facilities Act does

not contain an intelligible principle.  Pls.' Opp'n at 15–17.  This is so, they claim, because the

Facilities Act allows free range for the Mayor to "set any standard [she] likes" without regard to

any limiting principles.  *Id.* at 16.  Plaintiffs claim that under the language of the Facilities Act,

the Mayor could forbid college degrees, require a Ph.D., or demand compliance with physical

tests.  *See id.*  Plaintiffs maintain that the Mayor's authority to set minimum standards of

operation at child development facilities under the Facilities Act equals the authority of the

legislature itself.  *Id.*  With respect to the statutory delegations that authorize agencies to set

minimum qualifications in other contexts, Plaintiffs say that the Court should treat those

differently because they are subject to judicial review under the Administrative Procedure Act.

*Id.* at 17–18.  According to Plaintiffs, nothing could be done if the Mayor or OSSE required

childcare providers to become, for example, certified public accountants because the DCAPA

does not allow for judicial review of rulemakings.  *Id.*  The Court understands Plaintiffs to argue

that because the DCAPA limits judicial review to "contested cases"—in other words, adjudications—the delegation of authority should be struck down even if the statute contains an intelligible principle.  *See id.* ("Therefore, even if OSSE's statute had ordered it to pursue an intelligible principle, there was no mechanism by which a court could determine that is was failing to actually do so or was acting arbitrarily, capriciously, or without substantial evidence."); *id.* at 20 ("For nondelegation purposes, what matters is whether there is any authority ensuring that an agency's exercise of its delegated legislative power is not arbitrary or capricious." (footnote omitted)).

The Court agrees with Defendants; the delegation of power in D.C. Code § 7-2036 does not amount to an unconstitutional delegation of legislative power.  The text of the statute and broader statutory context make clear an intelligible principle to guide the delegated authority. First, the text cabins the delegated power to "rules necessary to implement the provisions *of this subchapter*," which is titled "Child Development Facilities Regulation."  D.C. Code § 7-2036(a)(1) (emphasis added).  Second, the text limits the Mayor's authority to a specific population and subject.  The Facilities Act states that the Mayor shall set "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training."  *Id.* § 7-2036(a)(1)(A).  The "minimum standards of operation" must relate to "child development facilit[ies]" and must speak to "staff qualification, requirements and training."  *Id.* Third, the statutory definition of "child development facility" further guides the Mayor in setting appropriate minimum standards of operation.  A child development facility "means a center, home, or other structure that *provides care and other services, supervision, and guidance for children, infants, and toddlers* on a regular basis."  *Id.* § 7-2031(3) (emphasis added).  Plainly, the minimum standards of operation set by the Mayor must be directed at care, supervision, and

guidance for children, infants, and toddlers.  The narrow scope of this delegation of power does not require further direction or guidance.  *See Whitman*, 531 U.S. at 475.  The Mayor's delegated authority is "cabined by 'intelligible principles' delineating both the area in and the purpose for which" the minimum operating standards should apply.  *TOMAC*, 433 F.3d at 867.

The Court rejects Plaintiffs' contention that some other standard should apply because the DCAPA does not provide for judicial review of D.C. agency rulemaking.  Plaintiffs apparently contend that even with an intelligible principle to guide the delegation of power the delegation should be struck down because the DCAPA only allows for review of "contested cases."  *See* Pls.' Opp'n at 18; *see also* D.C. Code § 2-510(a).  But Plaintiffs cite no cases for the novel contention that delegations of power to D.C. agencies are per se unconstitutional or in violation of the D.C. Home Rule Act because of the gap in the DCAPA.  Moreover, the Court agrees with Defendants that caselaw supports the contention that D.C. agency rulemakings are reviewable. *See District of Columbia v. Sierra Club*, 670 A.2d 354, 359 (D.C. 1996) ("The availability of review by this court of agency decisions in 'contested cases' . . . does not preclude judicial review of other matters, because any party aggrieved by an agency's decision may initiate an appropriate equitable action in the Superior Court to seek redress." (internal alterations and quotations omitted)); *D.C. Hosp. Ass'n v. Barry*, 586 A.2d 686, 690–94 (D.C. 1991) (upholding D.C. Superior Court decision that found D.C. regulations were not arbitrary and capricious); *Capitol Hill Restoration Soc'y, Inc. v. Moore*, 410 A.2d 184, 188 (D.C. 1979) ("[W]e are not foreclosing all review . . . in other noncontested matters . . . .  Any party aggrieved by an agency's decision may initiate an appropriate equitable action in the Superior Court to seek redress."); *Dupont Circle Citizen's Ass'n v. D.C. Zoning Comm'n*, 343 A.2d 296, 308 (D.C. 1975) (en banc) (J. Gallagher concurring) (stating that a party will "always have access to the

trial court for review in an original proceeding" and can argue "that the agency action was

arbitrary and capricious"). In any event, whether or not the Mayor's actions pursuant to the

Facilities Act might be unreviewable does not control the nondelegation doctrine analysis. *See*

*Michigan Gambling Opposition*, 525 F.3d at 33 n.8.[4]

Because the Facilities Act contains an intelligible principle to guide the Mayor's

rulemaking authority, the Court finds that Plaintiffs have failed to state a plausible claim to relief

with respect to their nondelegation challenge.

## B. Due Process Claim

The Fifth Amendment to the U.S. Constitution provides that no person shall "be deprived

of life, liberty, or property, without due process of law." U.S. Const. amend. V. Plaintiffs claim

that the degree requirement contained in OSSE's regulations "does not further any valid public

health or safety purpose, and therefore violates Plaintiffs' right to due process of law on its face

and as applied." Am. Compl. ¶ 278. The government may infringe upon a fundamental liberty

or property interest "only if the infringement is 'narrowly tailored to serve a compelling state

interest." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 523 (D.C. Cir.

2003) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). Where no fundamental liberty or

property interest is at stake, "the Fifth Amendment requires only a rational basis." *Id.* (citing

---

[4] Plaintiffs argue that *Michigan Gambling Opposition* does not support the proposition
that the nondelegation doctrine analysis is unaffected by reviewability. *See* Pls.' Opp'n at 21.
The court in *Michigan Gambling Opposition* stated "[n]or are we concerned, for purposes of the
non-delegation doctrine, that the Secretary's decision . . . might be unreviewable in a court of
law . . . [the statute] intelligibly guides the Secretary's exercise of discretion, and that is all that
the non-delegation doctrine requires." 525 F.3d at 33 n.8. The Court understands this to mean
that whether an agency's actions are reviewable does not change the nondelegation doctrine
analysis. But even assuming *arguendo* that Plaintiffs could potentially win this point, they fail to
cite any precedent that suggests that the nondelegation doctrine analysis should change if agency
action is not subject to judicial review. Nor do they cite any precedent explaining how the
analysis should change.

*FCC v. Beach Commc'ns Inc.*, 508 U.S. 307, 313 (1993); *Waters v. Rumsfeld*, 320 F.3d 265, 268 (D.C. Cir. 2003).  Under rational basis review, to survive a motion to dismiss, a plaintiff must plead "facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'"  *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (quoting *Dumaguin v. Sec'y of Health and Hum. Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)); *see also Am. Fed'n*, 330 F.3d at 523 (applying same standard for rational basis review to substantive due process and equal protection challenges).

Defendants argue that Plaintiffs cannot overcome the deferential standard under a rational basis review.  Defs.' Mot. at 23.  Defendants state that the "rational relationship here is no more than that involved in requiring a science teacher to have science degree, an accountant to have an accounting degree, or a lawyer to have a law degree."  *Id.* at 24.  Defendants say that questioning whether the regulations will actually improve childcare, or whether some childcare workers will be unable to comply, or whether the data underlying OSSE's action actually supports the regulations does not change the deferential analysis.  *See id.* at 24–29.  In opposition, Plaintiffs point to a number of cases in other contexts where courts have struck down statutes after a rational basis review.  *See* Pls.' Opp'n at 29–30.  Plaintiffs say that here, the degree requirements in the regulations do "absolutely *nothing* to further" the legitimate government interest of promoting optimal childcare outcomes.  *Id.* at 30 (emphasis in original).  Plaintiffs argue that they should be entitled to develop a record to show that the degree requirements are unrelated to OSSE's purpose.  *Id.* at 31.  Defendants argue in reply that whether there is a rational basis for the regulations is a legal conclusion and that Plaintiffs cannot allege facts that survive a motion to dismiss in this case because "one could at least rationally speculate that requiring more advanced education would yield improved child care."  Defs.' Reply at 16–17, ECF No. 37.

The Court finds that Plaintiffs have failed to state a plausible claim to relief under the Due Process Clause.  The Court agrees with Defendants that "OSSE's regulations are plainly 'rational on [their] face.'"  *Id.* at 17 (quoting *Hettinga*, 677 F.3d at 479).  The regulations require individuals who will be caring for children, infants, and toddlers to take classes or obtain a degree in "early childhood education, early childhood development, child and family studies, or a closely related field."  D.C. Mun. Regs. tit. 5A-1, § 165.1.  A conceivable rational basis for the regulations is readily apparent: more early childhood education for childcare providers will lead to better childcare.  Given this plausible reason for the government action, the "inquiry is at an end."  *Beach Commc'ns*, 508 U.S. at 314 (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).  Even if Plaintiffs have data showing that the degree requirements at issue will not make for better childcare, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *Id.* at 315.[5]  It is rational to determine that the degree requirements in OSSE's regulations could improve early childhood care in the District of Columbia.  Plaintiffs have failed to "plead facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'"  *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin*, 28 F.3d at 1222). Accordingly, Plaintiffs fail to state a plausible claim under the Due Process Clause.

### C.  Equal Protection Claim

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

---

[5] For this reason, the parties' discussion of a 2015 report by the National Academies of Sciences is irrelevant.  *See* Defs.' Mot. at 26–29; Pls.' Opp'n at 32–33.  Whether the report supports or does not support the regulations does not change the "strong presumption of validity" afforded to laws under rational basis review.  *Beach Commc'ns*, 508 U.S. at 314.

Plaintiffs' equal protection claim alleges that OSSE's rules draw arbitrary distinctions with respect to the degree requirement. *See* Am. Compl. ¶¶ 283–88. Such distinctions are subject to rational basis review. *See Gebresalassie v. District of Columbia*, 170 F. Supp. 3d 52, 60 (D.D.C. 2016). "A statutory classification that 'neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga*, 677 F.3d at 478 (quoting *Beach Commc'ns*, 508 U.S. at 313). Like rational basis review of due process claims, at the motion to dismiss stage, an equal protection challenge to a statute that does not involve a classification along suspect lines or fundamental rights—like the challenge here—requires overcoming a "strong presumption of validity," *Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010), by "plead[ing] facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification,'" *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin*, 28 F.3d at 1222). Again, like with a due process challenge, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

Plaintiffs challenge three distinctions made in the OSSE regulations on equal protection grounds. *See* Am. Compl. ¶¶ 283–286. First, Plaintiffs argue that the regulations draw "an arbitrary and irrational distinction between day-care providers . . . and other kinds of child-care providers, such as nannies" *Id.* ¶ 283. Second, Plaintiffs argue that the regulations draw "an arbitrary and irrational distinction between private, parochial, and independent schools with full-time elementary or secondary education programs with day cares attached . . . and private, parochial, and independent schools with attached day cares . . . that serve elementary and

secondary-school age children in other capacities." *Id.* ¶ 284.  Third, Plaintiffs argue that the

regulations draw "an arbitrary and irrational distinction between day-care center teachers who

already have a college degree and those who do not." *Id.* ¶ 286.  Day-care center teachers who

already have a college degree "must obtain *at least 24* semester credit hours in an early-

childhood field" whereas those "who do *not* have a degree must obtain an associate's degree

with a *major* in an early-childhood field, which may require *less than 24* semester credit hours."

*Id.*  Plaintiffs argue that none of these distinctions rationally relate to a legitimate government

purpose.  *See* Pls.' Opp'n at 24–28.

        The District argues that the three distinctions Plaintiffs point to all survive rational basis

scrutiny.  Defs.' Mot. at 30–35.  The District suggests that distinguishing between day-care

teachers and other child care workers—such as babysitters, nannies, and parent-supervised play

groups—makes sense because the other child care workers, who are exempt from the degree

requirement, do not usually care for three or more unrelated children.  *Id.* at 31.  Furthermore, the

District argues that these other child care workers are not performing the same type of work as a

teacher at a child development center, so the distinction is rational.  Defs.' Reply at 10.  Treating

schools with full-time elementary and secondary programs differently than schools that only

offer part time programs also makes sense, the District says, because OSSE could have

reasonably concluded that day cares attached to full-time elementary or secondary schools are

already more likely to have staff with relevant college degrees.  Defs.' Mot. at 33.  Finally, the

District argues that treating child development center teachers who already have college degrees

differently than teachers who do not have a degree also has a plausible rational basis.  *Id.* at 34–

35.  The regulations require teachers who already have college degrees in a non-early-childhood

field to earn twenty-four credit hours in early childhood studies.  *See id.*  The District contends

that the twenty-four-credit hour requirement is an appropriate approximation even though there may be some degree programs that require more or fewer credits. *Id.* at 34–35 (citing *Beach Commc'ns*, 508 U.S. at 316 n.7 ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." (quoting *Metropolis Theatre Co. v. Chicago*, 288 U.S. 61, 69–70 (1913)).

The Court finds that Plaintiffs have failed to plead sufficient facts to state a plausible equal protection claim with respect to each distinction. The Court agrees with Defendants that each distinction survives a rational basis review. First, distinguishing between child development facility employees and other childcare givers, like nannies and babysitters, makes sense. The Court agrees with Defendants that these other caregivers have a different set of demands on their time, usually care for smaller numbers of children, and are generally individually selected by parents. *See* Defs.' Reply at 10–11. It is completely rational to exempt more informal childcare from the degree and licensure requirements precisely because they are more informal. It would also be rational for OSSE to conclude that the other types of caregivers perform work that is different in kind from the caregivers covered by the regulations. Plaintiffs fail to address this conceivably rational basis for the distinction. Instead, Plaintiffs dismiss the potential differences between different types of caregivers and argue that "child-care providers are performing the same work, wherever they happen to work." Pls.' Opp'n at 26. This is no answer, though, to the plausible basis for the distinction offered by Defendants.

Second, treating day cares attached to full-time elementary or secondary schools differently from day cares attached to institutions that do not offer full-time educational services also has a conceivably rational basis. As Defendants note, "OSSE could reasonably think that day cares operated by and co-located with full-time elementary or secondary schools are already

more likely than other institutions to have staff with relevant college degrees, and that there is

thus less need to impose a degree requirement on them." Defs.' Mot. at 33. Plaintiffs do not

address this potential basis for the distinction. Instead, Plaintiffs argue that this distinction

makes the regulations "so underinclusive as to be irrational." Pls.' Opp'n at 26.[6] The Court

disagrees. The explanation offered by Defendants represents a potential rational basis for the

distinction. OSSE could reasonably decide to target specific childcare institutions that

potentially have more underqualified staff. Plaintiffs must do more than merely assert that the

distinction is irrational. At this stage, Plaintiffs must show facts that establish there is no

conceivable rational basis for the proffered distinction. Although Plaintiffs obviously disagree

with this distinction in the regulations, they have failed to overcome the deferential rational basis

review.

Third, the distinction between teachers who already have a college degree and those who

do not also has a plausible rational basis. Plaintiffs suggest that because it may be possible for a

teacher without a college degree to obtain the requisite associate's degree with fewer than

twenty-four credit hours in early-childhood education classes, it is irrational to require twenty-

four credit hours for those who already possess a college degree in some other subject. Pls.'

Opp'n at 24–25. The Court agrees with Defendants, who argue that OSSE had to set the bar

somewhere and selecting twenty-four credit hours "as an approximation of a major's worth of

---

[6] Plaintiffs cite *Williams v. Vermont* to suggest that this distinction is similar to a statute that granted car-tax credits to state residents depending on their residency at the time the car was purchased. *See id.* (citing *Williams v. Vermont*, 472 U.S. 14, 23 (1985)). The Court found "no relevant difference between motor vehicle registrants who purchased their cars out-of-state while they were Vermont residents and those who only came to Vermont after buying a car elsewhere." *Williams*, 472 U.S. at 27. Here, there is a conceivably plausible difference between the two categories offered by Defendants such that disparate treatment makes sense. Day care facilities without attached full-time elementary or secondary schools may be more likely to have underqualified caregivers. OSSE could rationally aim to address that potential deficiency.

study easily passes constitutional muster." Defs.' Mot. at 35; *see also Beach Commc'ns*, 508 U.S. at 316 n.7 ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." (quoting *Metropolis Theatre*, 288 U.S. at 69–70)). Choosing to set the bar at twenty-four credit hours represents a rational, while perhaps rough, estimate for the appropriate amount of early childhood education for teachers in child development facilities. Plaintiffs complain that the regulations will allow some teachers to comply with the degree requirements while taking fewer early childhood education classes than others who already have college degrees. Pls.' Opp'n at 25. But this argument fails to account for the fact that teachers without a college degree will be required to take far more courses to obtain their associate's degree, *see* Am. Compl. ¶ 175 (estimating sixty credit hours for Ms. Sanchez), than teachers who already have college degrees. OSSE could have rationally added the additional classes required for an associate's degree to its calculus for determining the appropriate amount of education. But even crediting Plaintiffs' argument, OSSE did not have to review all possible associate's degree programs to ensure logical coherence because it "had to draw the line somewhere" and "must be allowed leeway to approach a perceived problem incrementally." *Beach Commc'ns*, 508 U.S. at 316.

At bottom, Plaintiffs failed to overcome the "strong presumption of validity" that rational basis review demands.[7] *Beach Commc'ns*, 508 U.S. at 314. As the Supreme Court has stated:

> Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—"inevitably requires that some persons

---

[7] Plaintiffs cite a number of cases from other jurisdictions to support their claim that equal protection challenges to occupational-licensing requirements can survive a motion to dismiss. *See* Pls.' Opp'n at 23. Plaintiffs do not argue, and the Court does not find, that these cases bear any factual resemblance to this case. The Court agrees that it is not impossible for an equal protection challenge to survive rational basis review. Plaintiffs' challenge, however, does not. *See Hettinga*, 677 F.3d at 478–80 (affirming district court's dismissal based on application of rational basis review).

> who have an almost equally strong claim to favored treatment be placed on different
> sides of the line, and the fact [that] the line might have been drawn differently at
> some points is a matter for legislative, rather than judicial, consideration."

*Id.* at 315–16 (quoting *Fritz*, 449 U.S. at 179 (internal quotation marks and citation omitted)); *see*

*also Hettinga*, 677 F.3d at 479 ("Although the classification might indeed be unfair to

[plaintiffs], mere disparity of treatment is not sufficient to state an equal protection violation.").

Plaintiffs have failed to plead sufficient facts to "establish that there is not 'any reasonable

conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga*,

677 F.3d at 479 (quoting *Dumaguin*, 28 F.3d at 1222).[8]  As such, Plaintiffs have failed to state a

plausible equal protection claim.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 33) is **GRANTED**.

Plaintiffs' motion for discovery notwithstanding the motion to dismiss (ECF No. 32) is **DENIED**

**AS MOOT**.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  January 13, 2021                                    RUDOLPH CONTRERAS
                                                                        United States District Judge

---

[8] The Court's deferential rational basis review passes no judgment on the wisdom of the challenged regulation's degree requirement, makes no assessment of whether there are actual benefits to be derived therefrom, and offers no evaluation of the real burdens it imposes on workers that may lose their jobs or on parents who are likely to pay more for childcare as a result.